# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

No. 03-3829

MARK BELL,

Plaintiff-Appellant,

v.

TERE DUPERRAULT,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 02 C 707—**William C. Griesbach**, *Judge*.

_____

ARGUED APRIL 13, 2004—DECIDED MAY 12, 2004

_____

Before FLAUM, *Chief Judge*, and POSNER and WILLIAMS,
*Circuit Judges*.

FLAUM, *Chief Judge*. Mark Bell owns a vacation home on
the shoreline of Lake Michigan's Green Bay in Door County,
Wisconsin. In 1993, Bell obtained a permit from the
Wisconsin Department of Natural Resources ("DNR") in
order to construct a private pier into the bay. In 1998, Bell
decided to expand his pier. He therefore attempted to obtain
a permit from the DNR so he could build a 60-foot extension
onto his existing pier, a rubble mound breakwater that was
45 feet long and 15 feet wide, and a temporary road on the

lakebed to aid construction. The DNR objected to Bell's permit application and required that Bell proceed with an administrative hearing on the issue. Instead of proceeding with the administrative hearing, Bell filed suit alleging that the DNR violated his rights under the Equal Protection Clause of the Fourteenth Amendment. The district court granted summary judgment to the DNR's agent, Tere Duperrault, and Bell now appeals. For the reasons stated herein, we affirm.

## I. BACKGROUND

Under Wisconsin law, landowners may not build structures in navigable waters without a permit from the DNR. *See* Wis. Stat. § 30.12 (1989). Upon receiving a permit application, the DNR either proceeds without a hearing, or if a substantive written objection to issuance of the permit has been received, schedules a public hearing. *See* Wis. Stat. § 30.02(3). A substantive written objection is "a written statement giving specific reasons why a proposed project . . . may violate the statutory provisions applicable to the project and specifying that the person making the objection will appear and present information supporting the objection in a contested case hearing." Wis. Stat. § 30.01(6b). The DNR itself can object to a permit application even if no member of the public has objected.

Beginning in the late 1990's, the DNR became concerned about the environmental impact of private structures filling the waterways. Therefore, in 1997 the DNR put all pending applications on hold while it engaged in an environmental assessment of such structures. The DNR's assessment was completed in April 1998 and prompted a shift in policy under which permit applications were subjected to increasingly rigorous scrutiny. Of the 33 applications pending from 1997, only 11 permits were granted. Since 2000, no permits have been issued for new private solid piers or breakwalls.

Bell's problems with the DNR began on February 4, 1998, when he filed his application to extend his pier and build a breakwater. Bell's permit application was assigned to Tere Duperrault, who was then the DNR's Water Management Specialist for Door County. Duperrault reviewed Bell's application, visited Bell's property for a field inspection, and met with Bell on several occasions. During one of these meetings, Duperrault kept Bell waiting in her office for approximately thirty minutes while she engaged in a personal phone call with her feet propped on the windowsill. The meeting did not result in any resolution of the application, which frustrated Bell who had driven for six hours to attend the meeting. Even worse from Bell's perspective was that the meeting was futile because Duperrault had already decided to oppose Bell's application on behalf of the DNR.

The DNR was not the only party opposed to Bell's application, however. Bell's permit application also received public objections from the Door County Environmental Council, the Gibraltar Preservation Council, and an individual citizen, Kurt Pagel. Duperrault determined that all three objections were timely and substantive.

In February 1999 Bell filed an amended application with the DNR reducing the size of his pier extension and temporary road and adding plans for dredging. Bell's amended application was nearly identical to the application of one of his neighbors, John Hockers, who had been granted a permit without a hearing in 1998. However, in June 1999 Duperrault informed Bell that the DNR was opposing his application. She stated that his proposal would negatively impact fisheries, water quality and aquatic habitat, as well as natural scenic beauty. Moreover, Bell's amended application was still objected to by Kurt Pagel and the Door County Environmental Council. Bell's case was therefore scheduled for an administrative hearing.

Rather than proceeding with the hearing, Bell filed suit against the DNR in federal court. Bell's complaint alleges

that the DNR, and specifically its agent, Tere Duperrault, violated the Equal Protection Clause of the Fourteenth Amendment when Bell was denied a permit unless he participated in an administrative hearing. Bell argues that many of his neighbors had been granted permits without hearings, and that he was treated unequally for no legitimate reason. The DNR replies that none of the neighbors were similarly situated to Bell, either because of the timing or nature of their applications.

The first of the neighbors that Bell asserts was similarly situated is John Hockers. Hockers applied for a pier extension on February 4, 1998, which was the same filing date as Bell's original application. Bell acknowledges that Hockers's planned structure was less extensive than Bell's original proposed pier. But Bell contends that his amended application was nearly identical to Hockers's application and therefore should have been granted. The DNR responds that although Bell's second application was similar to Hockers's, it was filed more than a year later when the DNR's standards had become much more strict.

The second allegedly similarly situated individual was John Koehn, who filed an application for a new pier in March 1998. Koehn's permit was granted without a hearing in September 1998, despite objections from Kurt Pagel and the Door County Planning Department. However, the DNR argues that Koehn's pier was significantly different from Bell's pier extension because the Koehn pier had an 80-foot flow-through section. Large flow-throughs allow the free movement of water and materials along the shoreline, and the DNR considers them to be ecologically advantageous. Neither of Bell's proposals included a flow-through.

The last two individuals whose plans were allegedly similarly situated to Bell's were Tim Halbrook and Marc Pescheret. Both filed applications for permits for reconstruction in 2000 which were granted without hearings. The

DNR contends that these individuals were not similarly situated to Bell because the DNR treats applications to replace dilapidated older structures with new ones more favorably than applications to build entirely new structures. The DNR reasons that replacing old structures provides a net gain for the environment. Indeed, both the Halbrook and Pescheret applications were for the replacement of old piers that did not have flow-throughs with piers that did have flow-throughs.

## II. DISCUSSION

This Court reviews the district court's grant of summary judgment in favor of Duperrault *de novo. See Basith v. Cook County*, 241 F.3d 919, 926 (7th Cir. 2001). In so doing, we must construe all facts in the light most favorable to Bell, the nonmoving party. *See McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003). However, "we are not required to draw every conceivable inference from the record." *Id.* Inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion. *Id.*

With these standards in mind, we proceed to address the merits of Bell's equal protection claim. Typically equal protection claims involve charges of singling out members of a vulnerable group for unequal treatment or charges that a law or policy makes irrational distinctions between groups of people. *See Esmail v. Macrane*, 53 F.3d 176, 178 (7th Cir. 1995). However, equal protection claims may also involve a "class of one," where the plaintiff alleges that only he "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). The "class of one" plaintiff bears the burden of proving that he has suffered intentional, irrational, and arbitrary discrimination. *See id.* at 564-65. He can do so either by showing that he was treated differently from

identically situated persons for no rational reason, or that he was treated worse than less deserving individuals for no rational reason. *See Esmail*, 53 F.3d at 179 (stating that "equal protection does not just mean treating identically situated persons identically. If a bad person is treated better than a good person, this is just as much an example of unequal treatment . . . ."). Bell argues that he was in such a class of one when the DNR denied his permit application unless he took part in a hearing while granting permits to other similarly situated individuals without a hearing.

Unfortunately for Bell, his argument fails because he has not shown that others were actually similarly situated. Bell has provided no facts disputing that the DNR applied increasingly rigorous scrutiny to permit applications beginning in mid-1998 and continuing over the next several years due to environmental concerns. Therefore, Bell's amended proposal, filed in February 1999, was not similarly situated to Hockers's proposal which was filed in February 1998. It is also undisputed that after the environmental assessment was released in April 1998, the DNR began emphasizing the importance of "flow-through" structures which would allow littoral currents to flow freely. For this reason, Bell's proposal which lacked a flow-through was not similar to Koehn's, Halbrook's, or Pescheret's proposals which all included flow-throughs. Additionally, Koehn's application was filed in March 1998, eleven months before Bell's amended proposal. And while Halbrook and Pescheret did not apply for permits until 2000, they were both replacing already existing structures rather than creating entirely new structures. The DNR argues that such renovations receive preference over applications for new structures because of the net gain to the environment when dilapidated older structures are replaced.

Bell of course contests that these applicants were similarly situated to himself. He asserts that since the envi-

ronmental assessment was completed in April 1998, all permits reviewed after April 1998 should have been treated equally. He further points to various elements of the proposed renovation projects that actually made them much more destructive than his own proposal. Finally, he argues that no one informed him that flow-throughs were important factors, and therefore it is a reasonable inference that flow-throughs were not important factors.

None of these arguments enables Bell to carry the "very significant burden" of a class of one plaintiff. *See Discovery House, Inc. v. Consolidated City of Indianapolis*, 319 F.3d 277, 282-83 (7th Cir. 2003). It is not enough that the DNR acted in a way that Bell believes to be ineffective or even destructive. Rather, Bell must "eliminate any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id.* at 282 (internal quotation omitted). He has not done so. The evidence shows that the DNR decided to increasingly scrutinize applications beginning in 1998 because of environmental concerns. This policy decision is a rational one. Also rational is the DNR's preference for structures that allow currents to flow naturally and for older structures to be renovated when they become run-down. Furthermore, the DNR did not have any obligation to inform Bell of its reasoning in 1998. *See id.* It is possible, of course, that had Bell proceeded with his administrative hearing and created a more fulsome record on this issue, he may have discovered evidence that the DNR had no basis for these policies or that the policies were completely irrational. We find it puzzling that Bell chose to withdraw his permit application and file suit in federal court rather than attempt to eliminate the problem or at least develop the record with a simple administrative hearing. But on this record, we are left with nothing more than Bell's speculation and conjecture that a jury could have disbelieved all of the DNR's evidence. This is not enough to survive a summary judgment motion.

Nor does Bell's claim succeed when his arguments regarding Duperrault's alleged discriminatory animus are added into the mix. Specifically, Bell argues that Duperrault demonstrated personal hostility toward him which indicates that she deliberately sought to deprive him of equal protection of the laws.[1] Bell's evidence on this point consists of evidence that Duperrault refused to reschedule a meeting although Bell informed her that his wife was ill, that Bell then drove six hours to attend the meeting which Duperrault postponed for thirty minutes while she engaged in a personal phone call with her feet on the windowsill, and that the meeting did not result in any resolution of Bell's application. Bell further notes that Duperrault had in fact already decided to oppose Bell's application, but did not inform him of this decision until several months later.

While Duperrault's alleged behavior was perhaps inconsiderate or inappropriate, it does not demonstrate the type of "deep-seated animosity" that this Court has found to support an equal protection claim. *See Esmail*, 53 F.3d at 178. Such animosity occurs when "a powerful public official pick[s] on a person out of sheer vindictiveness," or when

---

[1] As a preliminary matter, Bell argues that the Supreme Court eliminated the requirement of subjective animus from class of one claims in *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000), and that this Court's precedent to the contrary should be overturned. We note first that the Supreme Court explicitly declined to reach the issue of subjective ill will in *Olech*, and therefore did not eliminate the possibility that such evidence could be used to state an equal protection claim. *Id.* at 565. Even if the Supreme Court's holding was otherwise, Bell did not raise this argument below, and it is thus waived. *See Williams v. REP Corp.*, 302 F.3d 660, 666 (7th Cir. 2002) (stating that a party waives any argument that it did not make to the district court). However, we choose not to reach the issue because its determination is not necessary for the resolution of this case. As will be discussed, Bell cannot show discriminatory treatment either with or without evidence of subjective animus by Duperrault.

an official acts "for the sole and exclusive purpose of exact-ing retaliation and vengeance against" the plaintiff. *Id.* Bureaucratic inefficiencies and even downright rudeness do not rise to this level. Were our decision to the contrary, the judicial system would overflow with equal protection claimants seeking damages for the discourteous treatment they received from various public servants. Therefore, Bell cannot establish a genuine issue of material fact that Duperrault violated his rights under the Equal Protection Clause when she required him to proceed with his permit application by attending an administrative hearing.

## III. CONCLUSION

For the foregoing reasons, the grant of summary judg-ment in favor of the defendant is AFFIRMED.

POSNER, *Circuit Judge*, concurring. I join the majority opinion, but write separately in an effort to clarify the standard (on which the majority opinion is prudently noncommittal) applicable to "class of one" equal protection cases. The lack of clarity has been remarked by commenta-tors. Robert C. Farrell, "Classes, Persons, Equal Protection, and *Village of Willowbrook v. Olech*," 78 *Wash. L. Rev.* 367, 400-25 (2003); J. Michael McGuinness, "The Impact of *Village of Willowbrook v. Olech* on Disparate Treatment Claims," 17 *Touro L. Rev.* 595, 603-06 (2001); Timothy Zick, "Angry White Males: The Equal Protection Clause and 'Classes of One,'" 89 *Ky. L.J.* 69, 133-34 (2000); Shaun M. Gehan, Comment, "With Malice Toward One: Malice and

the Substantive Law in 'Class of One' Equal Protection Claims in the Wake of *Village of Willowbrook v. Olech*," 54 *Me. L. Rev.* 329, 379-80 (2002); Nicole Richter, Note, "A Standard for 'Class of One' Claims Under the Equal Protection Clause of the Fourteenth Amendment: Protecting Victims of Non-Class Based Discrimination from Vindictive State Action," 35 *Val. U.L. Rev.* 197, 199-203 (2000). It has been a cause of justifiable concern to the judges who have to decide these cases. See, e.g., *Northwestern University v. City of Evanston*, No. 00 C 7309, 2002 WL 31027981, at *3-4 (N.D. Ill. Sept. 11, 2002).

   In the usual equal protection case, including cases of selective prosecution, which are the converse of denial-of-permit cases such as the present one, the plaintiff is complaining about discrimination against a group to which he belongs, such as a racial, religious, or ethnic minority (though it needn't be a minority: witness sex-discrimination cases). See, e.g., *United States v. Armstrong*, 517 U.S. 456, 465-68 (1996); *Desi's Pizza, Inc. v. City of Wilkes-Barre*, 321 F.3d 411, 424-26 (3d Cir. 2003). It has long been apparent, however, that there could be a denial of equal protection even though the victim did not belong to a class larger than himself. E.g., *City of New Orleans v. Dukes*, 427 U.S. 297, 298, 303-04 (1976) (per curiam); *Indiana State Teachers Ass'n v. Board of School Comm'rs*, 101 F.3d 1179, 1180-81 (7th Cir. 1996); *Esmail v. Macrane*, 53 F.3d 176, 180 (7th Cir. 1995); *Ciechon v. City of Chicago*, 686 F.2d 511, 524 (7th Cir. 1982); *Rubinovitz v. Rogato*, 60 F.3d 906, 910-12 (1st Cir. 1995); *Yerardi's Moody Street Restaurant & Lounge, Inc. v. Board of Selectmen*, 878 F.2d 16, 20-21 (1st Cir. 1989). The troubling question is what exactly the plaintiff in such a case must prove in order to make out a prima facie case. In *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (per curiam), the Supreme Court held that it is enough to allege "irrational and wholly arbitrary" treatment. *Id.* at 565. Did the Court mean to suggest by its

choice of words that the "rational purpose" test used standardly in equal protection jurisprudence for cases not involving "fundamental rights" also rules class-of-one cases? That is a frightening thought, because, as we noted in *Milner v. Apfel*, 148 F.3d 812, 816-17 (7th Cir. 1998), the "rational purpose" test is no longer as toothless as it once seemed, see, e.g., *Romer v. Evans*, 517 U.S. 620, 634-35 (1996); *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 446-50 (1985); *United States Dept. of Agriculture v. Moreno*, 413 U.S. 528, 533-38 (1973); *Lawrence v. Texas*, 123 S. Ct. 2472, 2484-85 (2003) (O'Connor, J., concurring), and anyone can be a class-of-one plaintiff. Or should "irrational and wholly arbitrary" be understood as a more stringent test? But if so, what is its precise meaning? And what significance should be attached to the fact that the case had been decided on the pleadings?

The Court in *Olech* was affirming a decision of this court in which we had said that a plaintiff in a class-of-one case has to prove "that the cause of the differential treatment of which [he] complains was a totally illegitimate animus toward the plaintiff by the defendant." 160 F.3d 386, 388 (7th Cir. 1998). Justice Breyer's concurring opinion in the Supreme Court endorsed our formulation, 528 U.S. at 565-66, but drew no direct response from his colleagues. Their silence requires interpretation.

In *Hilton v. City of Wheeling*, 209 F.3d 1005, 1008 (7th Cir. 2000), decided after and, we thought, consistently with the Supreme Court's decision in *Olech*, we restated the standard in class-of-one cases as follows: "to make out a prima facie case the plaintiff must present evidence that the defendant deliberately sought to deprive him of the equal protection of the laws for reasons of a personal nature unrelated to the duties of the defendant's position." It should be noted that "reasons of a personal nature unrelated to the duties of the defendant's position" go beyond personal hostility to the plaintiff (i.e., animus), the motive

emphasized in our *Olech* opinion and in Justice Breyer's concurrence. Personal reasons can include larceny, as in *Forseth v. Village of Sussex*, 199 F.3d 363, 371 (7th Cir. 2000), or a desire to find a scapegoat in order to avoid adverse publicity and the threat of a lawsuit, as in *Ciechon v. City of Chicago, supra*, 686 F.2d at 524—improper motives for a public official (scapegoating is not a legitimate tactic of public officials any more than stealing is), but different from personal hostility.

We have hewed to the *Hilton* line in other post-*Olech* cases as well. *Purze v. Village of Winthrop Harbor*, 286 F.3d 452, 455 (7th Cir. 2002); *Cruz v. Town of Cicero*, 275 F.3d 579, 587 (7th Cir. 2001); cf. *Discovery House, Inc. v. Consolidated City of Indianapolis*, 319 F.3d 277, 283 (7th Cir. 2003). But in still others we have described animus as an *alternative* to the Supreme Court's standard, *Nevel v. Village of Schaumburg*, 297 F.3d 673, 681 (7th Cir. 2002); *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001), though if a class-of-one plaintiff can prevail by demonstrating "irrational and wholly arbitrary" action, it is unclear why he would ever bother with proof of animus, since unequal treatment due solely to animus is a subset of irrational and arbitrary conduct.

Some cases from other circuits merely repeat the formula recited by the Supreme Court majority in *Olech*. *Cobb v. Pozzi*, No. 02-7218, 2004 WL 736799, at *18 (2d Cir. Apr. 2, 2004); *Tri-County Paving, Inc. v. Ashe County*, 281 F.3d 430, 439-40 (4th Cir. 2002); *Costello v. Mitchell Public School Dist. 79*, 266 F.3d 916, 921-22 (8th Cir. 2001). Others, however, pin their flag to "reasons of a personal nature," or some variant, and are thus like *Hilton*. *Williams v. Pryor*, 240 F.3d 944, 951 (11th Cir. 2001); *Shipp v. McMahon*, 234 F.3d 907, 916-17 (5th Cir. 2000), overruled on other grounds in *McClendon v. City of Columbia*, 305 F.3d 314, 329 (5th Cir. 2002); *Bryan v. City of Madison*, 213 F.3d 267, 276-77 and n. 17 (5th Cir. 2000). Still others

consider the question whether after *Olech* a personal motive is required an open one. *Hayut v. State University of New York*, 352 F.3d 733, 754 n. 15 (2d Cir. 2003); *DeMuria v. Hawkes*, 328 F.3d 704, 707 n. 2 (2d Cir. 2003); *Giordano v. City of New York*, 274 F.3d 740, 743 (2d Cir. 2001); cf. *Bartell v. Aurora Public Schools*, 263 F.3d 1143, 1149 (10th Cir. 2001). Only one decision is explicit that proof of a personal motive is *not* required, *Jackson v. Burke*, 256 F.3d 93, 96-97 (2d Cir. 2001) (per curiam)—and the court that decided it later described the assertion as "dicta" and, consistent with other Second Circuit decisions that we have cited, described the question whether a personal motive is required as open. *Harlen Associates v. Incorporated Village of Mineola*, 273 F.3d 494, 499-500 (2d Cir. 2001).

The decisions that treat the standard as open after *Olech* gain support from *DeMuria v. Hawkes*, *supra*, 328 F.3d at 706-07, which points out that Olech's suit had been dismissed on the pleadings and that all the Supreme Court held was that to withstand a motion to dismiss the plaintiff need *allege* only "irrational and wholly arbitrary" treatment. The Court did not explain what precisely the plaintiff must *prove* to satisfy this standard. It is not as if the term "irrational and wholly arbitrary" were self-defining. The fact that the Court declined Justice Breyer's invitation to put flesh on its skeletal test does not conclude analysis of what that flesh might look like. If the issue is open, the resolution of it proposed in *Hilton* and like cases is not foreclosed.

I think those cases are on the right track and are not inconsistent with *Olech*. The Court said it had granted certiorari "to determine whether the Equal Protection Clause gives rise to a cause of action on behalf of a 'class of one' where the plaintiff did not allege membership in a class or group," 528 U.S. at 564, not to establish the standard governing proof in such cases. The Court did say, it is true,

that "these allegations [that the defendant was acting in an 'irrational and wholly arbitrary' manner], *quite apart from the [defendant's] subjective motivation*, are sufficient to state a claim for relief under traditional equal protection analysis." 528 U.S. at 565 (emphasis added). And so cases on which I am relying may be fighting a doomed rearguard action. May the Court enlighten us; the fact that the post-*Olech* cases are all over the map suggests a need for the Court to step in and clarify its "cryptic" (Zick, *supra*, at 133) per curiam decision.

The problem for which requiring proof of improper motive is a possible solution is that irrational differences in treatment having nothing to do with discrimination against a vulnerable class abound at the bottom rung of law enforcement. A police car is lurking on the shoulder of a highway in a 45 m.p.h. zone, a car streaks by at 65 m.p.h., and the police do nothing. Two minutes later a car streaks by at 60 m.p.h. and the police give that driver a ticket. Is it a denial of equal protection if the police cannot come up with a rational explanation for why they ticketed the slower speeder? If so, the federal courts will be swamped with "class of one" cases remote from the purpose, and beyond the feasible scope, of the equal protection clause. Or suppose that an asylum officer, after interviewing a foreign visitor to the United States who has applied for asylum, recommends that he be turned down, yet another asylum officer, in (as he knows) a rationally indistinguishable case, recommends that "his" applicant be granted asylum. The difference is irrational because, by hypothesis, like situations are being treated differently; that is what unequal treatment means.

Since differences of treatment of this sort at the lowest operating level of government cannot be avoided, they should not—unless invidiously motivated—give rise to a constitutional claim. They should not be deemed "irrational and wholly arbitrary," any more than a random audit by the

Internal Revenue Service should be thought *wholly* arbitrary, though it is arbitrary in the sense that other, identically situated taxpayers who are not audited are being treated differently. Notice how, in the asylum example and also in the present case, involving the denial at the initial application level of a permit to enlarge a pier, taking the equal protection route bypasses the administrative and judicial review procedures established to remedy arbitrary official action. In such cases the equal protection remedy is superfluous, or at least premature. It is highly unlikely that the Supreme Court intended in *Olech* to open the door to such cases.

The reason that a number of court of appeals cases, and Justice Breyer in his concurrence in *Olech*, brought motive into the picture is that requiring proof of a bad motive brings the class-of-one cases into harmony with the standard equal protection cases and the purpose behind the equal protection clause. That purpose is to protect the vulnerable, whether it is a racial or religious minority, a sexual majority (women) that had nonetheless been subjected to invidious discrimination, a racial majority that as in *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273 (1976), finds itself oppressed by a national minority that has a local majority, or even a coal company that because its major assets (its mines) cannot be shifted to another state finds itself targeted for discriminatory taxation, as in *Allegheny Pittsburgh Coal Co. v. County Comm'n*, 488 U.S. 336, 342-46 (1989). These are all cases in which the unequal treatment complained of is either vicious or exploitative (or frequently both), and the fundamental insight of the class-of-one cases is that vicious or exploitative discrimination can sometimes be found even when the victim does not belong to a group that is a familiar target of such treatment. Indeed, a lone victim picked out for social or economic oppression or extinction can be especially vulnerable. *Esmail v. Macrane*, *supra*, 53 F.3d at 180. Unlike the member of even a minority group, he has no allies at all.

I add "exploitative" to "vicious" to make clear that, as in the formulation in *Hilton*, personal ill will is not the essential criterion of a meritorious class-of-one suit. It is enough if the plaintiff can prove that the defendant is treating similarly situated people differently for improper (normally personal) reasons, whether his motive is hatred or greed or, as in *Ciechon*, fending off pests. Those reasons, however, must be the *only* reasons for the adverse action of which the plaintiff is complaining. If there are legitimate as well as illegitimate reasons, the presence of the latter will not taint the former. E.g., *Albiero v. City of Kankakee*, *supra*, 246 F.3d at 932. It would be absurd to give a convicted murderer a remedy under the equal protection clause merely because the prosecutor, in addition to thinking it his duty to prosecute, hoped that the publicity from a successful prosecution would enable him to launch a political career.

"Motive" tests are not very satisfactory and are therefore sparingly employed in the law. Motives are difficult to discern and often they are irrelevant to the social interests in a case, as where someone is prosecuted for murder in causing a fatal plane crash though his motive was not to kill but merely to reap a profit from selling airline stock short. *United States v. McAnally*, 666 F.2d 1116, 1119 (7th Cir. 1981). "[M]otive does not equal intent; fraud, larceny, embezzlement, and the other financial crimes and their tort equivalents are actionable even when the motive for the wrongful conduct is benign." *Eastern Trading Co. v. Refco, Inc.*, 229 F.3d 617, 623 (7th Cir. 2000); see also *United States v. Davis*, 183 F.3d 231, 244 (3d Cir. 1999); *Johnson v. Phelan*, 69 F.3d 144, 155-56 (7th Cir. 1995) (separate opinion). Yet motive is sometimes given legal significance, most famously perhaps in the old spite-fence cases (see references in *Original Great American Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 280-81 (7th Cir. 1992)) but also in assessing punitive damages, e.g., *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 538-39

(1999), and, of course, in criminal sentencing. E.g., *Wisconsin v. Mitchell*, 508 U.S. 476, 485 (1993). I haven't been able to think of a better way of reining in the class-of-one cases, which have an ominous potential to burst the proper bounds of equal protection law, than to insist that an improper motive by a government official have been the sole cause of the inequality of treatment of which the plaintiff is complaining.

Treatment that is arbitrary only because of human or institutional fallibility rather than because unlawful motives are in play is not an apt occasion for constitutional litigation. Although it is thought in some quarters ignoble to allow considerations of caseload to influence the scope of substantive rights, the federal courts have limited capacity and an attempt to cope with a relentlessly and steeply rising caseload by enlarging the number of judges and courts would create serious problems of control and coherence. As the Supreme Court once observed in a related context, "The federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies. We must accept the harsh fact that numerous individual mistakes are inevitable in the day-to-day administration of our affairs." *Bishop v. Wood*, 426 U.S. 341, 349-50 (1976).

A true Copy:

      Teste:

 

                        _____
                        *Clerk of the United States Court of*
                        *Appeals for the Seventh Circuit*