In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-3240

FARES PAWN, LLC, and
WILLIAM K. SAALWAECHTER,

*Plaintiffs-Appellants*,

*v.*

INDIANA DEPARTMENT OF
FINANCIAL INSTITUTIONS, *et al.*

*Defendants-Appellees*.

Appeal from the United States District Court for the
Southern District of Indiana, Evansville Division.
No. 11-cv-136 — **Richard L. Young**, *Chief Judge*.

ARGUED APRIL 3, 2014 — DECIDED JUNE 20, 2014

Before POSNER, FLAUM, and ROVNER, *Circuit Judges*.

FLAUM, *Circuit Judge*. Indiana businesses that engage in
pawnbroking activity must get a license from the state's De-
partment of Financial Institutions (DFI). The plaintiff in this
case, William Saalwaechter, owns Fares Pawn LLC, a pawn
shop in Evansville, Indiana. He applied for a license in
March 2009, but DFI denied his application, citing concerns

about previous pawnbroking on the property and about his store manager's criminal history. Saalwaechter brought an administrative action challenging the denial. He eventually received a license after he signed a memorandum of understanding agreeing to comply with certain conditions, in particular not employing the worrisome manager.

Saalwaechter is convinced that the license-application process should have gone much more smoothly than it did. After getting his license, he sued DFI in federal court for violating the Equal Protection Clause of the Fourteenth Amendment. Saalwaechter did not contend that DFI treated him unfavorably on account of some identifiable characteristic, such as age, sex, or race. He simply argued that the state had singled him out for disparate treatment without a rational basis. This is a so-called "class-of-one" theory, which rests on the premise that "[w]hen those who appear similarly situated are nevertheless treated differently, the Equal Protection Clause requires at least a rational reason for the difference, to ensure that all persons subject to legislation or regulation are indeed being treated alike, under like circumstances and conditions." *Engquist v. Oregon Dep't of Agriculture*, 553 U.S. 591, 602 (2008) (internal quotation marks omitted).

The district court granted summary judgment in favor of the defendants, finding that no reasonable jury could conclude that DFI treated Saalwaechter differently from similarly situated applicants without a rational reason. We agree, and therefore affirm the judgment of the district court.

## I. Background

For many years, 1432 North Fares Avenue in Evansville has been home to a pawn shop. Three different businesses have occupied the property during the past two decades: Fares Loan, Evansville Pawn, and Fares Pawn. The names of these entities blend together. As we shall see, their owners overlapped, too.

Terry and Linda Duke owned Fares Loan, the original pawn shop on Fares Avenue. In 1998, DFI ordered the Dukes to remove a store manager, who was allegedly engaged in criminal activity, and also to comply with all applicable law. Six years later, DFI learned that federal authorities were investigating the Dukes' son, who worked at the shop, for receipt of stolen goods and firearms violations. DFI agreed to postpone any licensing proceedings against Fares Loan until the federal investigation was complete. By that time, though, the Dukes had decided to quit the pawn business and sell the store, so DFI opted to let the matter lie.

The Dukes sold to Tom Carroll and William Saalwaechter, two men who lived just across the border from Evansville in Owensboro, Kentucky. Carroll, an attorney, structured the deal and drew up the pertinent documents; Saalwaechter, who had recently sold his petroleum distribution business, provided the capital. The precise terms of the transaction were murky, however. Later, government regulators would have trouble understanding the deal, and some of the particulars remain unclear even on appeal. Apparently, even Saalwaechter did not know exactly what was going on; he would later sue Carroll as the deal fell apart.

As best we can tell, Saalwaechter expected that he would purchase the property and pawn business from the Dukes; lease everything back to a third party, Ryan McDaniel; and eventually, after giving McDaniel time to put together financing, sell to him at a small profit. While they put together financing, McDaniel and the former manager of Fares Loan, Jeremy Kamuf, would continue to operate the shop and make regular payments to Saalwaechter in exchange for the repurchase option. In essence, Saalwaechter would extend a short-term bridge loan to be paid back, with interest, within just a few months.

The plan hit a snag when Kamuf failed to make the required monthly payments. Saalwaechter investigated, only to find out that McDaniel did not know about the deal at all—what Saalwaechter had thought to be McDaniel's guarantee of the loan turned out to be a forgery. Saalwaechter evicted Kamuf from the premises but, without a functioning pawn shop on the property, worried that his real estate investment would quickly lose value.

Saalwaechter therefore decided his best course was to operate the pawn business himself. To his surprise, he discovered that he had never purchased the pawn business or its inventory, just the underlying real estate. It later became clear that Tom Carroll had purchased the Fares Loan assets himself. Carroll had also set up a new company, Evansville Pawn LLC, obtained a pawn license, and retained someone named John Jones to manage it (alongside Kamuf, it seems). Carroll showed Saalwaechter documents describing the deal and containing Saalwaechter's signature, but Saalwaechter claimed that he had never seen them before.

The plot further thickened when DFI received materials indicating that Carroll had procured the Evansville Pawn license on behalf of Kamuf, who was paying Carroll a monthly fee for the business (separate from the fee Kamuf was paying Saalwaechter for the real estate). Such "straw licensing" is prohibited under Indiana law. Ind. Code § 28-7-5-10.5. DFI refused to renew Evansville Pawn's license, and ordered Carroll to wind up his pawn business.

Saalwaechter then decided to create his own entity, Fares Pawn LLC. Just before Evansville Pawn's license was set to expire, Saalwaechter and Carroll agreed that Fares Pawn would take possession of Evansville Pawn's inventory and liquidate its outstanding pawns. Saalwaechter also applied for a pawn license for Fares Pawn. Until DFI approved the application, he planned to operate as a buy/sell business. Unlike a pawnbroker, a buy/sell business does not take the customer's property as collateral for a short-term loan, but instead buys the item outright. This sort of business does not require a license, but it is less lucrative than pawning.

Shortly after Saalwaechter submitted his license application, DFI informed him that, because he had no background in the pawn industry, he would need to find a store manager with two years' experience. Saalwaechter, who had expected to manage the store himself, reluctantly listed the only person he knew with that qualification: John Jones, the manager for Evansville Pawn.

This choice proved to be inauspicious. Months later, while running background checks for Saalwaechter's application, DFI learned that Jones had previously been convicted of a theft- and drug-related felony in Kentucky (the convic-

tion was later downgraded to a grade A misdemeanor).[1] DFI also concluded that Jones had not been forthright with officials when they interviewed Jones and Carroll about Carroll's pawn license application in 2007. Specifically, Jones had not told DFI that he was related to Linda Dukes, the former owner of Fares Loan, and had not mentioned anything about Jeremy Kamuf's involvement in Evansville Pawn.

Based on this information, DFI told Saalwaechter that they would not give him a license so long as Jones worked at the pawn shop. Saalwaechter, who earlier had not wanted to hire Jones, now protested. He claimed that he had worked alongside Jones for several months and considered him a good employee. Saalwaechter later met with two members of the DFI staff, John Schroeder and Mark Tarpey, to try to explain the situation, but did not dispel their concerns.

A brief word about DFI's application process may be appropriate at this point. DFI is required to evaluate each applicant's and his affiliates' "financial standing, competence, business experience, and character" to determine whether the business will be operated "honestly, fairly, and efficiently" and whether "the convenience and needs of the public exist for the operation of the business in the community." Ind. Code § 28-7-5-8. Once it determines that these conditions are met, DFI "shall issue" the license to the applicant. *Id*. DFI's director has delegated authority to approve routine

---

[1] Prior to 2009, DFI lacked the authority to run criminal background checks through the Federal Bureau of Investigation. Furthermore, store managers did not have to disclose their criminal history to DFI, only applicants. *See* Ind. P.L. 1-2009 § 149; Ind. Code § 28-7-5-4(b), (d) (making these changes). It appears that DFI did run a state background check on Jones in 2007, but it did not reveal any felony conviction.

applications personally. Ind. Code § 28-11-1-11. Should the director decline to exercise his delegated authority, however, the application is referred to the full seven-member board.

Saalwaechter's application came before DFI's director, David Mills, in September 2009. Mills had arrived at DFI only a few days beforehand, and Saalwaechter's was among the first applications Mills considered. In light of the tangled sequence of transactions, the history of straw licensing at the site, and Saalwaechter's insistence on employing Jones, DFI staff expressed concern that the application was not routine. The staff recommended that Mills decline to exercise his delegated authority. Mills agreed. Saalwaechter's application thus proceeded to the full board.

While the hearing before the board was pending, DFI presented Saalwaechter with a proposed memorandum of understanding (MOU) and requested his response. The MOU provided that DFI would grant Saalwaechter a license if, among other things, he agreed not to employ Jones in any capacity. In his reply, Saalwaechter thanked DFI for the opportunity to address the board but again conveyed his belief that Jones was fit to manage the business. He wrote:

> I have worked daily, side by side, with Mr. Jones for 5 months and found him to be a good employee, trust worthy [*sic*] and competent in pawn shop operations. I investigated the accusations made against Mr. Jones and was never able to confirm anything in his current history that reflects inherent criminal conduct or tendencies.

* * *

Mr. Jones did a foolish thing 5 years ago as a single man, but since has a wife, a two year old girl, a four year old boy and a mortgage.

As you see I am defending Mr. Jones in circumstances that may be rumor and some are unfortunate. I would like to have the opportunity to employ Mr. Jones in a Christian owned business. Certainly, however, I will accept the MOU if all consideration for approving my application without it has failed.

Saalwaechter did not sign the MOU.

Also before the hearing, John Schroeder, one of the DFI employees who had interviewed Saalwaechter earlier in the process, prepared a memorandum describing the complicated backstory at 1432 North Fares Avenue. The memo flagged four issues for the board to consider: (1) Saalwaechter's role, if any, in the straw-licensing scheme between Carroll and Kamuf; (2) Saalwaechter's desire to retain Jones; (3) uncertainty as to whether Saalwaechter intended to obtain a license on his own behalf or for a third-party; and (4) Saalwaechter's unconventional business acquisitions, some of which, the memo noted, had apparently drawn the attention of the police in Saalwaechter and Carroll's Kentucky hometown. Ultimately, Schroeder recommended that the board deny Saalwaechter's application, citing "concerns with [his] role in the prior straw license, concerns with respect to [his] business transactions, and concerns relative to [his] choice for a manager."

The board convened in October 2009. Saalwaechter tried once more to explain to the members how he came to the business and why he wished to pursue a pawn license. He

mentioned that he was contemplating a lawsuit against his former partner, Carroll, and discussed two other lawsuits that he was involved in, both stemming from other business transactions. He also discussed Jones' prior criminal convictions and attempted to rebut allegations that Jones had lied to DFI staff to help Carroll keep his license.

At the close of Saalwaechter's remarks, Mills, the DFI director, told him that "the only thing clear with the discussion of all the transactions you just summarized is a lack of clarity" and noted that he could not understand "why you don't just get rid of this asset and go on to doing things that you want to do." Another board member also mentioned a "lack of clarity" and stated that "I am not convinced that everything here is … something that we should … just give an unequivocal approval to." When Mills moved to deny the application, Saalwaechter told him, "I think you are penalizing something and a person that you shouldn't be because of all these other people that didn't [] have their ducks in a row. … This [presumably, his relationship with Tom Carroll] is actually one mistake. It was, it was just dealing with one person." The board voted to deny the application.

Saalwaechter soon filed an administrative action challenging the board's denial. This action was dismissed when, after mediation, Saalwaechter agreed to sign the MOU and commit not to employ Jones. In return, DFI granted him his license, fifteen months after he applied. Fares Pawn has since operated without incident.

In October 2012, Saalwaechter sued the state of Indiana, DFI, and associated state officials under 42 U.S.C. § 1983. He alleged that the defendants had violated his right to equal protection by singling him out for unfair treatment, and

sought as damages attorney's fees for the administrative action and lost profits for the time that Fares Pawn continued to operate as a buy/sell business. (Saalwaechter also brought claims sounding in due process and in state law; these claims are no longer at issue in the case and we will ignore them.) The district court granted summary judgment to the defendants.

## II. Discussion

It is clear that a class-of-one plaintiff must show (1) that he has been intentionally treated differently from others similarly situated, and (2) that there is no rational basis for the difference in treatment. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). What is less clear is whether a class-of-one plaintiff must also allege, and ultimately prove, that the government officials acted with some kind of bad motive not grounded in their public duties. In *Del Marcelle v. Brown County Corp.*, 680 F.3d 887 (7th Cir. 2012) (en banc), this court divided over that question, leaving no controlling opinion.

Fortunately, in this case, we can put to one side the dispute over the role that motive plays in class-of-one claims. "[A] given action can have a rational basis and be a perfectly logical action for a government entity to take even if there are facts casting it as one taken out of animosity." *Flying J Inc. v. City of New Haven*, 549 F.3d 538, 547 (7th Cir. 2008). If we can come up with a rational basis for the challenged action, that will be the end of the matter—animus or no. *See D.B. ex rel. Kurtis B. v. Kopp*, 725 F.3d 681, 686 (7th Cir. 2013) ("[T]he test for rationality does not ask whether the benign justification was the *actual* justification. All it takes to defeat the plaintiffs' claim is a *conceivable* rational basis for the difference in treatment."). Accordingly, we shall assume

(somewhat doubtfully) that there is evidence in this case from which a jury could conclude that state officials harbored ill-will against Saalwaechter, and proceed to determine whether there is some conceivable rational basis for the way DFI handled his case nonetheless.[2]

Saalwaechter bears the burden of showing that he was treated differently without a rational reason. *Bell v. Duperrault*, 367 F.3d 703, 707 (7th Cir. 2004). Normally, a class-of-one plaintiff will show an absence of rational basis by identifying some comparator—that is, some similarly situated person who was treated differently. *E.g., Purze v. Village of Winthrop Harbor*, 286 F.3d 452, 455 (7th Cir. 2002). The theory behind this approach is that "if all principal characteristics of the two individuals are the same, and one received more favorable treatment, this may show there was no proper motivation for the disparate treatment." *Swanson v. City of Chetek*, 719 F.3d 780, 784 (7th Cir. 2013).[3]

---

[2] "Rational basis" is shorthand for "rational relationship to some legitimate governmental purpose," *see, e.g., Armour v. City of Indianapolis*, 132 S. Ct. 2073, 2080 (2012), for a government official may have a very rational reason for discriminating against an individual and yet still run afoul of the Fourteenth Amendment. Consider, for example, a police officer who harbors an idiosyncratic animus against a particular person and unjustifiably issues him parking ticket after parking ticket in an attempt to harass him. Such conduct is perfectly rational—in the sense that the officer's actions (the incessant ticketing) bear a very logical relationship to his preferred outcome (pestering the unhappy vehicle owner)—but nevertheless unconstitutional, because there is no *legitimate* reason for state officials to single out somebody for poor treatment in this way. *See Geinosky v. City of Chicago*, 675 F.3d 743 (7th Cir. 2012).

[3] In unusual circumstances, where plaintiffs put forth what amounts to direct evidence of arbitrary treatment, we have allowed them to mount a

Saalwaechter has identified three candidates for a similarly situated entity; all three, he argues, were treated better than he was without any valid justification. Generally, "whether individuals are similarly situated is a factual question for the jury." *McDonald v. Village of Winnetka*, 371 F.3d 992, 1002 (7th Cir. 2004). However, summary judgment is appropriate "where it is clear that no reasonable jury could find that the similarly situated requirement has been met." *Id.* We agree with the district court that for each proposed comparator, either no reasonable jury could conclude that Saalwaechter and the comparator were similarly situated, or there was a rational basis for any differential treatment.

*First*, Saalwaechter argues that he was similarly situated to Tom Carroll, who received his license for Evansville Pawn just thirty-six days after he applied. Carroll listed Jones on his October 2007 application just like Saalwaechter did in 2009. Thus, Saalwaechter contends, "[a] jury could find that because DFI felt Jones was good enough for Evansville Pawn, DFI should also have found that he was good enough for Fares Pawn." This is baffling. Jones was no longer "good enough" in 2009 because that was when DFI officials learned that Jones had an undisclosed felony, and further concluded

---

class-of-one claim without pointing to comparators. *E.g.*, *Swanson*, 719 F.3d at 785 (holding that identification of a specific harasser, a plausible motive, and a series of actions that appear "illegitimate on their face" suffices to state a claim); *Geinosky*, 675 F.3d at 748–49 (holding that a pattern of twenty-four bogus tickets in twelve months by itself states a claim). We see no basis to depart from the similarly-situated approach in this case, where the evidence of animus is slight at best and where alternative, legitimate explanations are not difficult to find.

that Jones had lied to them *during the Evansville Pawn application interview* two years earlier.

Saalwaechter contends that there is evidence in the record that DFI knew about Jones' criminal record well before 2009. (There is no evidence that DFI knew in 2007 that Jones had lied about his relationship to Linda Dukes and about Kamuf's role at Evansville Pawn, but no matter.) He points to a letter DFI received from Linda Dukes in February 2007 that lists Jones as an employee and states that he "had a former charge which has been amended to a Class A misdemeanor." We reject Saalwaechter's contention that this letter should have put DFI on notice of Jones' felony conviction when it considered Evansville Pawn's application. Dukes wrote in response to DFI's investigation of Fares Loan after her son got into trouble with federal authorities for firearms violations; the letter had nothing to do with Evansville Pawn. Nor could it have, since Carroll did not file his license application until eight or nine months after Dukes' letter was sent. Moreover, the contents of the letter hardly make clear that Jones had a prior felony conviction. Jones was listed as one of three employees at Fares Loan, "of which *none have felonies*" (emphasis added).

For the sake of argument, let us suppose with Saalwaechter that Dukes' letter should have put DFI on "inquiry notice" about Jones' felony conviction when it handled Evansville Pawn's application. There is still no evidence that DFI managed to confirm this information until 2009. (To the contrary, DFI was not authorized to run an FBI background check in 2007, and the state background check for Jones showed nothing of concern.) Remember that a class-of-one claim requires evidence that the plaintiff was *intentionally*

treated differently from someone similarly situated. Negligent or accidental differential treatment does not count. *See Olech*, 528 U.S. at 564; *Snowden v. Hughes*, 321 U.S. 1, 8 (1944) ("[A]dministration by state officers … resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination."). It is absurd to say that because DFI should have known in 2007, but didn't, that Jones had a former felony, the Fourteenth Amendment required DFI to ignore that fact when it later surfaced in 2009. Government is permitted to correct its past oversights even if certain parties wish it would repeat them. And anyway, as we said, we do not see how DFI made a mistake in the first place.

*Second*, Saalwaechter argues that he was similarly situated to Chase Fiechter, the owner of a pawn shop on the other side of Indiana called Parlor City Pawn. Before Fiechter owned Parlor City, the shop belonged to his friends, Tim and Heidi Bryant. The couple was forced to give up their pawn license after authorities arrested Tim Bryant for firearms violations; their son, Clayton, was also convicted of a misdemeanor in connection with the same incident. After these events, Fiechter decided that he would take over the shop. He applied for a license and sought to retain Clayton Bryant as the store's manager. DFI, worried about a straw license, refused. Eventually, Fiechter agreed to sign a memorandum of understanding stating that he would not employ Clayton Bryant. Director Mills then granted Fiechter his license.

We again question whether Saalwaechter and Fiechter were similarly situated. True, both men had personal histories with the previous owners of pawn shops on the same

property, and both fought to employ persons with criminal backgrounds before relenting. But Clayton Bryant had not previously lied to DFI officials, as Jones had, and neither Fiechter nor the Bryants had any history of straw licensing or any messy and mysterious business transactions between them. *Cf. Sung Park v. Indiana Univ. School of Dentistry*, 692 F.3d 828, 833 (7th Cir. 2012) (noting that class-of-one claims must account for "all of [the plaintiff's] conduct"). In any event, DFI asked both Saalwaechter and Fiechter to sign MOUs with similar conditions (not employing John Jones or Clayton Bryant, respectively). And DFI gave both men their licenses as soon as they unambiguously agreed to sign. No equal protection violation here.[4]

Saalwaechter nevertheless complains that Fiechter was given his MOU *before* Director Mills decided whether to exercise delegated authority over Fiechter's application, whereas Saalwaechter did not receive the MOU until his application was already set to go before the entire board. The fact that he was not granted a license via delegated authority, Saalwaechter argues, is itself evidence of unequal treatment.

We agree with the district court that there was a valid reason for this small difference in timing: Director Mills had only been on the job for a few days when he decided that Saalwaechter's non-routine application should be reviewed by the whole board. During this time Mills, whose responsibilities at DFI covered much more than pawn licensure, had

---

[4] Saalwaechter argues that his earlier response to the board—that he would "accept the MOU if all consideration for approving my application without it has failed"—should have sufficed. We think not, especially because at the hearing he continued to defend Jones and never expressed his clear intent to sign the MOU.

to devote much of his attention to the failure of Indiana's second-largest bank. It was perfectly legitimate for Mills to determine that, under the circumstances, approving the application without the benefit of full board review was not a wise exercise of his discretion. By contrast, Fiechter applied for his license two years later, when Mills had less on his plate and more experience as director.

*Third*, and finally, Saalwaechter suggests another pawn shop in Evansville, called "Deal Brothers," as a comparator. Deal Brothers initially operated as a buy/sell, so it was not required to obtain a pawn license. However, DFI discovered that the shop was purchasing items, adding a mark-up and tax, and then selling the items back to customers on layaway—activity that, in DFI's view, constituted "pawning." Consequently, Deal Brothers applied for a pawn license.

DFI soon received word that Deal Brothers' owner, George Belt, had gotten into an altercation with a customer. Reportedly, the encounter culminated with Belt waving a gun in the customer's face and forcing him out the door. The police investigated but did not file charges. When DFI inquired about the incident, Belt explained that the customer—upset that his girlfriend had sold the customer's property in order to post his bail—had become loud and aggressive after Belt told him that Deal Brothers was not a pawn shop and that he could not redeem the items. Belt said he pulled the gun because he thought the customer was reaching under his shirt for a weapon and Belt feared for his life. The director of DFI granted Deal Brothers its license four months later.

Saalwaechter argues that George Belt had "done things that a reasonable fact finder could find to be 'worse' than what Fares Pawn was accused of," so that the decision to

grant Deal Brothers' application and deny Fares Pawn's was irrational. This argument misses the point. It may be true that, as Saalwaechter reminds us, "[i]f a bad person is treated better than a good person, this is just as much an example of unequal treatment as when … a good person [is treated] worse than an equally good person." *Esmail v. Macrane*, 53 F.3d 176, 179 (7th Cir. 1995). But an applicant cannot fashion a triable class-of-one claim merely because he can locate another applicant accused of arguably "worse" conduct. As with any comparator, the question is whether, given the red flags in each of their applications, DFI had a rational basis for licensing Deal Brothers and not licensing Fares Pawn. *See Bell*, 367 F.3d at 707. Clearly, it did—DFI believed Belt when he said that he acted in self-defense, and it either did not believe or found insufficient Saalwaechter's explanation for the numerous causes for concern that surfaced in his own application. That is not a violation of the Equal Protection Clause.

\* \* \*

In *Engquist v. Oregon Department of Agriculture*, the Supreme Court held that public employees cannot bring class-of-one claims against their public employers because the theory is "simply a poor fit" in the employment context, which necessarily "involve[s] discretionary decisionmaking based on a vast array of subjective, individualized assessments." 553 U.S. at 603, 605. The defendants urge us to extend *Engquist*'s approach to Indiana's pawn-licensing scheme—or at least to Mills' decision not to exercise delegated authority—both of which, the defendants suggest, also demand consideration of subjective, discretionary factors. *Cf. United States v. Moore*, 543 F.3d 892, 901 (7th Cir. 2008) (applying *Engquist* to a class-of-one claim based on the govern-

ment actor's exercise of prosecutorial discretion). *But see Hanes v. Zurick*, 578 F.3d 491, 495 (7th Cir. 2009) (noting that courts should be cautious when extending *Enquist*'s rationale beyond the public-employment context). In light of the preceding analysis, we have no need to decide whether class-of-one claims are indeed a "poor fit" for the licensing process established by Indiana law.

We do note, however, that "the practical problem with allowing class-of-one claims to go forward in [the public employment] context is … that governments will be forced to defend a multitude of such claims in the first place, and courts will be obliged to sort through them in a search for the proverbial needle in a haystack." *Engquist*, 553 U.S. at 608. Because "taking the equal protection route bypasses the administrative and judicial review procedures established to remedy arbitrary official action," *Bell*, 367 F.3d at 712 (Posner, J., concurring), such a task seems especially wasteful when Indiana already offers an administrative channel to challenge the wrongful denial of license applications.

Regardless, having sorted through this haystack and found no needle, the judgment of the district court is

AFFIRMED.