In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 20-1868

145 FISK, LLC,

*Plaintiff-Appellant,*

*v.*

F. WILLIAM NICKLAS,

*Defendant-Appellee.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Western Division.
No. 19-cv-50093 — **Philip G. Reinhard**, *Judge.*

———————————

ARGUED DECEMBER 10, 2020 — DECIDED JANUARY 26, 2021

———————————

Before SYKES, *Chief Judge*, and FLAUM and KANNE, *Circuit Judges*.

FLAUM, *Circuit Judge*. Illinois authorizes municipalities to invest in revitalizing areas of "commercial blight." *See* 65 Ill. Comp. Stat. 5/11-74.4 *et seq.* The City of DeKalb, Illinois (the "City"), entered into a preliminary agreement to allocate just such an incentive to 145 Fisk, LLC ("Fisk"). After more due diligence, however, the City reversed course.

Fisk is convinced the City would have proceeded with the funding as planned but for the meddling of City Manager F. William Nicklas. According to Fisk, Nicklas sought to retaliate against it and favor other local developers in violation of its First and Fourteenth Amendment rights. The district court dismissed Fisk's suit for failure to state a claim upon which relief can be granted and relinquished supplemental jurisdiction over the remaining state law claims. Because we agree that Fisk has not plausibly stated grounds for relief, we affirm the judgment of the district court.

## I. Background

Plaintiff-appellant Fisk is a limited liability company. The entity was formed on December 13, 2018, and it consisted of two members, one of whom is an attorney ("Attorney Member").

Fisk alleges that for over two years it collaborated with the City regarding a proposed redevelopment of a dilapidated property at 145 Fisk Avenue in DeKalb. On December 18, 2018, the City adopted Resolution 2018-166 approving a Preliminary Development Incentive Agreement ("PDA") with Fisk regarding potential financing for the project. The PDA, into which the parties entered on or about January 1, 2019, provided that if Fisk met certain contingencies set forth therein, the City would provide an approximate $2,500,000 Development Incentive ("Development Incentive") in Tax Increment Financing ("TIF") to Fisk for the redevelopment. Per the PDA, the Development Incentive was "intended to be repaid as a forgivable incentive, payable through the generation of revenues from the development of the Property after the date of final plan approval."

Both the PDA and the Resolution, however, imposed conditions and obligations on both parties before finalizing the development agreement and distributing the funds. The Resolution provided that the City Council "hereby approves of the Development Incentive Agreement … subject to such amendments as shall be acceptable to the Mayor with the recommendation of the City Manager. Staff is authorized to negotiate and proceed with presentation of [the] Final Development Agreement for consideration of approval at a future date."

The PDA likewise subjected the Development Incentive to various contingencies. For example, Recital C of the PDA states "the Parties have entered into this Agreement so as to provide an incentive for [Fisk] to … proceed with the proposed project, subject to the contingencies outlined herein." Recital E continued: "[Fisk] acknowledges that the City is not required to provide the incentive contemplated herein …." Indeed, the extent of the arrangement is an "agreement to conditionally approve." The PDA further states in Article II(A) that "[Fisk] acknowledges all contingencies outlined in this Agreement, and agrees and acknowledges that until all such contingencies are fully satisfied, it has no basis to detrimentally rely upon the representations of the City with respect to the availability of incentive funding." With respect to costs incurred, under Article II(A) "[Fisk] agrees and acknowledges that any costs incurred prior to approval of a planned development agreement as contemplated herein … are *incurred at [Fisk]'s sole risk* and cost until such point in time as the Property is rezoned and the planned development agreement is approved, and any other conditions or contingencies outlined herein are satisfied in full." (Emphasis added). Even in defining the "Development Incentive," Article V(B) states "All

provisions of this Article V are contingent upon [Fisk] obtaining final approval of its plans, rezoning the Property, lender financing, and executing a planned development agreement as described above."

Amid the negotiations over the redevelopment project, a transition in the City's personnel marked the beginning of the end for Fisk's proposed Development Incentive. Around January 1, 2019, F. William Nicklas became the new City Manager. Unsatisfied with previous due diligence, Nicklas opened his own inquiries into Fisk's financial affairs and development plans. This included a series of in-person meetings and exchanges during February and March 2019 between Nicklas and Fisk's principals. Nicklas requested "personal information" about the principals, their affiliates, and their financial situation. Nicklas even spoke with the Attorney Member's personal banker. Nicklas also requested information about the corporate entity itself, including a worksheet to indicate its "financial viability." Fisk never, however, affirmatively states in the record what amount of working capital the principals or the corporate entity specifically had to fund the project contemplated by the PDA. By Fisk's account, all Nicklas's requests duplicated the City's prior ones and were not required by the Resolution or PDA.

Nicklas's review exposed cracks in the project's foundation. In an email to Fisk dated April 1, 2019, Nicklas stated he felt "duty-bound" to inform the Council that in his opinion Fisk did not have "the financial capacity or the experience" needed for the funding. Nicklas based this conclusion on submissions from Fisk, including the financial worksheet, a budget for three years of operation following 145 Fisk Avenue's completion, and the principals' own

"acknowledgment" during a March 2019 meeting that neither "ha[d] ever developed a hotel property in the past." Nicklas recommended Fisk withdraw its application. Specifically, Nicklas stated:

> [M]y judgment is based upon the following conclusions:
>
> 1. No balance sheet for 145 Fisk LLC has been submitted, but your submittal shows no current or long-term assets that can be pledged as collateral. The corporation controls a 24,000 square foot, uninhabitable facility with an estimated market value of only $300,000.
>
> 2. 145 Fisk LLC has not secured any sources of income to complete the project or operate the project upon its completion.
>
> 3. 145 Fisk LLC has no working capital and its operations are not generating any capital to pay for current expenses, much less the ongoing professional consulting fees incurred to date in the conceptual planning phase of the project.
>
> 4. On the basis of your submittal, it appears that 145 Fisk LLC is relying upon a $2.5 million TIF grant from the City and 100% of the balance of the equity funding from one or more financial institutions. Your submittal offers no working cash from the principals, or pledged private assets, or lines of credit, or other private equity to help finance the project.
>
> 5. You do not reveal the real and comparable hotel development upon which you are basing the

projected three-year profit and loss prospectus you submitted. Since you have not developed a hotel, your numbers are not rooted in an actual operation, so far as you have revealed. They [sic] are so many numbers on a page.

6. As you may know, TIF assistance carries a federal income tax liability. Your submittal shows no indication that 145 Fisk LLC could carry that liability except at the expense of the project's development.[1]

Disagreement ensued. In a series of subsequent exchanges, the Attorney Member reiterated that the corporate entity was "simply a holding [LLC] at this point" and Nicklas's "specific comments 1-6 [were]n't accurate, include[d] erroneous assumptions, [we]re disingenuous, or [we]re completely out of context." The Attorney Member emphasized "[a]ll [they] need is a loan commitment to proceed, but … commitment and income sources cannot be secured until a formal commitment from the City is finalized." Fisk also rejected Nicklas's recommendation to withdraw its application for the Development Incentive.

---

[1] The City Attorney reiterated these concerns as well. In an April 2, 2019 email attached as an exhibit to Fisk's operative complaint, he wrote the "fundamental question that the City Manager is trying to address is the appropriateness of and/or necessity for a financial incentive." Moreover, he contextualized that the City required submission of a detailed financial pro forma (along with other documents) in its review of previous requests for incentives for hotel projects that a third-party consultant reviewed for completeness, reasonableness, and accuracy. The City Attorney also invited Fisk to share any additional information in its possession.

As it turns out, the events of 2019 were not the first encounter between Nicklas and Fisk's members. The Attorney Member represented a client in a state court lawsuit involving the City of Sycamore. In response to an interrogatory dated April 21, 2017, that client identified Nicklas—who was previously Sycamore's City Manager—as a witness. Through the proceedings, an email surfaced in which Nicklas referred to regulatory requirements imposed by "[t]hat pesky Constitution" which "has strictures against artificial distinctions." However, the client in that suit was not Fisk. In fact, Fisk had not yet come into corporate existence.

During that same period, Nicklas considered two other development projects with which, Fisk alleges, Nicklas had previous financial and personal ties for funding incentives. The first was a TIF-backed hotel project with a developer named Shodeen. Nicklas had previously collaborated on a hotel with Shodeen that never came to fruition. The second was a TIF-backed apartment development project with John Pappas. Nicklas had previously represented Pappas's major investor, who intended to invest in the TIF-backed apartment, in consulting work.

Nicklas ultimately recommended the City terminate the PDA with Fisk. During an April 22, 2019, meeting, the City Council addressed Nicklas's findings. The City's Agenda notes indicated the City did not receive "the necessary financials and development plans to justify a permanent commitment to the allocation of $2.5 million" within 120 days of the Resolution. Specifically, the Council found the financial documents "were barren of any assurance that the LLC could afford ongoing preliminary planning and engineering fees." The Council further cited "insufficient project details" to

advance "to a formal development hearing." Specifically, the lack of documentation for a traffic impact study, final site engineering plans, "storm water management report examining the site's runoff," floor plans, and "variances or exceptions from the City's development ordinances." Accordingly, "[t]he Council determined that—on the basis of all known documents—there was no reasonable or informed basis upon which the project could be considered viable." The City Council unanimously voted to terminate the PDA. Fisk filed suit that same day.

Fisk commenced this action in federal court against Nicklas in his individual capacity claiming violations of state and federal law. The state law claims included tortious interference with Fisk's business expectancy, defamation per se, and defamation *per quod*. Relevant to this appeal, Fisk sued under 42 U.S.C. § 1983 for violations of its rights under the First and Fourteenth Amendments.

Nicklas moved to dismiss the complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). In lieu of a reply to Nicklas's Rule 12(b)(6) motion, Fisk obtained leave to file an amended complaint. Fisk filed the First Amended Complaint, the operative complaint for this appeal, on November 5, 2019. Pertinent here, Fisk claims Nicklas violated its First Amendment right (Count II), as well as its Fourteenth Amendment rights to due process (Count III) and equal protection (Count IX). Nicklas again moved to dismiss pursuant to Rule 12(b)(6). Fisk opposed and alternatively requested leave to replead.

On April 27, 2020, the district court dismissed Fisk's federal claims against Nicklas for failure to state a claim with

prejudice and relinquished jurisdiction over the supple-
mental state law claims.[2]

## II. Discussion

We review the district court's grant of Nicklas's motion to
dismiss de novo to determine whether Fisk has stated a claim
upon which relief can be granted. *Bridges v. Gilbert*, 557 F.3d
541, 545 (7th Cir. 2009). "We accept well-pleaded facts as true
and draw all reasonable inferences in the plaintiff['s] favor."
*Shipley v. Chi. Bd. of Election Comm'rs*, 947 F.3d 1056, 1060–61
(7th Cir. 2020). Notwithstanding that deference, "[t]o survive
a motion to dismiss, a plaintiff must allege 'enough facts to
state a claim to relief that is plausible on its face.'" *Boucher v.
Fin. Sys. of Green Bay, Inc.*, 880 F.3d 362, 365–66 (7th Cir. 2018)
(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

### A. First Amendment

Count II of the complaint alleges that Nicklas retaliated
against Fisk for exercising its First Amendment right. Specifi-
cally, Fisk alleges that as City Manager of DeKalb, Nicklas
blocked the Development Incentive and "orchestrated [a]
campaign" against Fisk because its Attorney Member ex-
posed unflattering information about Nicklas and named him
in discovery in connection with the unrelated 2017 lawsuit.
Fisk pleaded that the Attorney Member's representation in

---

[2] Fisk also added the City of DeKalb as a defendant in the First Amended
Complaint, claiming breach of contract and the duty of good faith and fair
dealing. The City moved to dismiss, or transfer, based on a forum selection
clause in the PDA. The district court relinquished the state law claims
against the City and therefore denied its motion to transfer as moot.

the 2017 lawsuit fell within "the First Amendment's right to petition the government for the redress of grievances." The district court dismissed Fisk's First Amendment retaliation claim, reasoning that Fisk did not engage in protected activity. That is because the client in the 2017 lawsuit, who is not a party to this litigation, engaged in protected activity by exercising *his or her* right to petition the government when he or she accessed the courts. Thus, that nonparty client has the right to be free from retaliation for exposing Nicklas, not Fisk.

To make a prima facie showing on its First Amendment retaliation claim, Fisk must establish that "(1) it engaged in activity protected by the First Amendment, (2) it suffered a deprivation that would likely deter First Amendment activity in the future, and (3) the First Amendment activity was … 'at least a motivating factor' in the Defendant['s] decision to take the retaliatory action." *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008) (quoting *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006)). We have recognized that a plaintiff's exercise of "[t]he First Amendment right to petition the government for the redress of grievances" may qualify for the first prong of a First Amendment retaliation claim. *See id.* Furthermore, the right to petition "extends to the courts in general and applies to litigation in particular." *Id.* (citing *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972); *NAACP v. Button*, 371 U.S. 415, 429–30 (1963)).

On appeal, Fisk argues the district court erred in concluding it did not engage in protected conduct to satisfy the first prong of a First Amendment retaliation claim. Fisk asserts that its protected conduct was "the work of one of its principals in [the 2017] litigation." It appears that Fisk *now* contends that the Attorney Member exercised his own First

Amendment right to free speech, as distinct from his right to petition the government. Specifically, Fisk asserts that the Attorney Member exposed Nicklas in the 2017 litigation, while acting as Fisk's agent, and thus the protected conduct is attributable to Fisk. Failing that, Fisk argues that even if we reject its arguments based on agency theory, Nicklas's retaliatory conduct against the Attorney Member for exercise of his free speech right nonetheless chilled Fisk from exercising its own First Amendment rights.

The district court did not "erroneously ignore[] agency principles" when it concluded that Fisk did not engage in protected activity in the 2017 lawsuit. The agency question is irrelevant because the district court rightfully found that the underlying right to be free from retaliation for petitioning the government belonged to neither Fisk nor the Attorney Member. As the district court explained, "[t]he Attorney Member named Nicklas as a witness in that suit on behalf of *his client* in that case. He did not do so on behalf of [Fisk]." (Emphasis added). Stated another way, the *client's* exercise of *its* First Amendment petition rights in 2017 cannot be Fisk's "protected conduct" for the purposes of *Fisk's* "petition for redress of grievances retaliation claim." *See Bridges*, 557 F.3d at 553 (dismissing claim because individual not party to lawsuit "ha[d] no 'underlying claim' that implicates his *own* right of access to the courts" (emphasis added) (quoting *Christopher v. Harbury*, 536 U.S. 403, 415 (2009))). Fisk did not exercise its First Amendment petition right; in fact, Fisk did not even exist prior to 2018. That First Amendment right ran to the client in the 2017 suit. Fisk cannot "rely on another plaintiff's injury in support of [its] own … claim" to show it engaged in protected activity. *Id.* at 554.

To the extent that Fisk advances a retaliation argument based on the exercise of *free speech* rights through the Attorney Member, that argument was waived.[3] Fisk contends that it engaged in protected free speech when the Attorney Member filed evidence and witness disclosures implicating Nicklas in the 2017 suit. *Cf. id.* at 551–52 (reasoning plaintiff's affidavit supplying his eyewitness account of alleged incident of inmate mistreatment by prison officials could plausibly amount to protected First Amendment speech). However, Fisk did not frame Count II in the operative complaint as a retaliation claim based on its exercise of its free speech rights. Rather, Count II referred exclusively to "[t]he First Amendment right to petition the government for the redress of grievances [that] extends to the courts in general and is protected activity," and alleged "[t]hat filing, prosecuting and defending the lawsuit where Defendant Nicklas was discovered as referring to the

---

[3] In its opening brief on appeal, Fisk refers broadly to a single form of protected conduct to satisfy the first prong of its First Amendment retaliation claim: "the work of one of its principals in parallel litigation." Then, in reply, Fisk appears to refer to two forms of "protected conduct": "Paragraph 139 of the Amended Complaint alleges a retaliation against speech and for accessing the courts, which is also a speech claim." To the extent Fisk attempts to add a new argument regarding the Attorney Member's *own* "access[] [to] the courts," Fisk may not raise a new theory in its reply brief. *United States ex rel. Berkowitz v. Automation Aids, Inc.*, 896 F.3d 834, 843 (7th Cir. 2018) ("Arguments raised for the first time in an appellate reply brief are waived."). However, whether we characterize this argument as two theories or one does not affect the crux of Fisk's argument: The Attorney Member, acting as Fisk's agent, engaged in protected conduct when it participated in the 2017 lawsuit, which in Fisk's view satisfied the first prong for a First Amendment retaliation claim. Nor does it affect our analysis. As we stated above, the petition right belonged to the client, and as we explain *infra*, Fisk never presented the free speech argument to the district court, and therefore it is waived.

Constitution as 'pesky' was a protected activity because 'the First Amendment's right to petition the government for the redress of grievances extends to the courts in general and applies to litigation in particular.'" In opposition to Nicklas's Rule 12(b)(6) motion in the district court, Fisk referred to "[t]he right to petition for redress of grievances … includ[ing] the right to file a claim before a judicial body. [*Cal. Motor Transp.*, 404 U.S. at 510]. The right to petition provides additional protection for communication specifically aimed at the redress of grievances."

Fisk therefore advances this free speech theory for the first time on appeal. "In civil litigation, issues not presented to the district court are normally forfeited on appeal." *Russian Media Grp., LLC v. Cable Am., Inc.*, 598 F.3d 302, 308 (7th Cir. 2010).

As a final backstop, Fisk asserts that "[e]ven setting agency principles aside" the First Amendment applies to close parties. In Fisk's view, Nicklas retaliated against the Attorney Member for his protected speech, which then chilled Fisk's speech. As with its free-speech-retaliation theory described above, Fisk did not argue this close-party theory to the district court below, so we decline to reach it on appeal. *Id.* ("[I]t will be a rare case in which failure to present a ground to the district court has caused no one—not the district judge, not us, not the appellee—any harm of which the law ought to take note." (citation and internal quotation marks omitted)).

Because Fisk has not alleged that the corporate entity itself engaged in any protected conduct, its First Amendment claim fails at the outset.

**B. Due Process**

We consider next Fisk's claim in Count III that Nicklas deprived it of its property in violation of the Fourteenth Amendment's Due Process Clause. Relying on our decision in *Barrows v. Wiley*, 478 F.3d 776 (7th Cir. 2007), the district court explained that Fisk had no constitutionally protected property interest because the PDA and contract for the purchase provided only "a right to acquire the property," not a right in the property itself, *see id.* at 780.

To prevail on a procedural due process claim, a plaintiff must make a threshold showing that it "possessed a constitutionally protected property interest." *Kim Constr. Co., Inc. v. Bd. of Trs. of Vill. of Mundelein*, 14 F.3d 1243, 1245 (7th Cir. 1994) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985)). "A property interest for purposes of the Due Process Clause is created by 'existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.'" *Id.* at 1245–46 (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)). But as we reiterated in *Kim*, "property is what is securely and durably yours under state … law, as distinct from what you hold subject to so many conditions as to make your interest meager, transitory, or uncertain." *Id.* at 1246 (alteration in original) (quoting *Reed v. Village of Shorewood*, 704 F.2d 943, 948 (7th Cir. 1983), *overruled on other grounds by Brunson v. Murray*, 843 F.3d 698 (7th Cir. 2016)).

On appeal, Fisk argues that the Resolution and PDA created a specific property right to the incentive. Alternatively, Fisk contends that the business relationship created by the

Resolution, the contract to purchase the underlying land (which was contingent on receipt of the incentive), and the right to zoning approval were, on their own, each sufficient for Fourteenth Amendment purposes.

Fisk's argument that the Resolution created a protectable interest fails. We have stated that "[t]o demonstrate a property interest worthy of protection under the [F]ourteenth [A]mendment's [D]ue [P]rocess [C]lause, a party may not simply rely upon the procedural guarantees of state law or local ordinance." *Cain v. Larson*, 879 F.2d 1424, 1426 (7th Cir. 1989). "[O]nly when the mandated procedure contains within it a *substantive* liberty or property interest" can such "purely procedural rules of … local law" give rise to a due process claim. *Lavite v. Dunstan*, 932 F.3d 1020, 1033 (7th Cir. 2019). The Illinois Supreme Court has pronounced that "[a] resolution or order is not a law, but merely the form in which the legislative body expresses an opinion." *Chi. & N. Pac. R.R. Co. v. City of Chicago*, 51 N.E. 596, 598 (Ill. 1898). The existence of the Resolution alone thus does not suffice to create a protected property interest; Fisk must identify some other "substantive liberty or property interest embedded within [relevant] procedural regulations." *Lavite*, 932 F.3d at 1034.

Fisk has not met that burden, as the plain language of the Resolution belies Fisk's characterization of it as "non-discretionary," i.e., as offering anything more than procedural rights. The Resolution was entitled "Authorizing A *Preliminary* Development Incentive Agreement," and the City Council resolved that "[s]taff is authorized to negotiate and proceed with presentation of *Final* Development Agreement for consideration of approval at a future date." (Emphases added). By its own terms, the Resolution did not bind or

otherwise "substantively limit[]" the City "by mandating a particular result when certain clearly stated criteria are met." *See Kim*, 14 F.3d at 1248 ("Where 'the requisite … mandatory language' is lacking, no protected interest is created." (alteration in original) (quoting *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 464 (1989))); *Hohmeier v. Leyden Cmty. High Schs. Dist. 12*, 954 F.2d 461, 465 (7th Cir. 1992) ("A rule or regulation … must have 'binding force' in order to create constitutionally protected property."). We therefore agree with the district court's conclusion that no constitutionally protected property interest arose from the Resolution.

The clear lack of binding language also defeats Fisk's unsupported assertion that the PDA created a protectable interest. The PDA was riddled with discretionary language. True, the PDA states, "the Parties agree and acknowledge that the Development Incentive as described herein is necessary in order to induce this project to occur, and satisfies all requirements applicable to such an incentive." However, tellingly, Fisk itself describes the PDA as a "mandatory *consideration* of the project." (Emphasis added). The PDA provided that Fisk "acknowledge[d] that the City is not required to provide the incentive contemplated herein." Elsewhere, the PDA further stated that until Fisk met all contingencies outlined in the PDA, "it ha[d] no basis to detrimentally rely upon the representations of the City with respect to the availability of incentive funding." The PDA therefore lacked "sufficient directives to the decisionmaker to support a claim of entitlement" to the Development Incentive. *See Kim*, 14 F.3d at 1248. For that same reason, Fisk's reliance on *Barrows* is misplaced; unlike *Barrows*, the parties here did not agree that "a right to" the contract existed. 478 F.3d at 779. Even setting that issue aside, *Barrows* offers little help to Fisk, because we held in that case

that the plaintiff did not have a cognizable procedural due process claim. *Id.* at 781–82.

Nor does Fisk's argument that the Resolution created a "business relationship" affect our analysis. Under Illinois law, the existence of a business relationship may be cognizable for tort protection. *See Miller v. Lockport Realty Grp., Inc.*, 878 N.E.2d 171, 175 (Ill. App. Ct. 2007). But Illinois tort law only "recognizes that a person's business relationships constitute a property interest" for purposes of creating an "entitle[ment] to protection from unjustified tampering by another." *Id.* (citing *Belden Corp. v. InterNorth, Inc.*, 413 N.E.2d 98 (Ill. App. Ct. 1980)). Illinois tort law does not transform a business relationship into a constitutionally protected property right. *See Reed*, 704 F.2d at 948 (urging courts to "look behind labels" and instead "ask whether under Illinois law" the interest in question is "securely and durably" the plaintiff's); *see also Rebirth Christian Acad. Daycare, Inc. v. Brizzi*, 835 F.3d 742, 747–48 (7th Cir. 2016) ("[W]hen determining the existence of a property interest … 'we must look behind labels.'" (quoting *Reed*, 704 F.2d at 948)). For the reasons already stated, the Resolution did not create a constitutionally protected property interest.

We find similarly unavailing Fisk's remaining argument that the underlying contract for the building and the rezoning decision established cognizable constitutional property interests. No cognizable interest stems from the underlying contract for the building. The contract was conditioned on the execution of a final development agreement, and thus that contract represented not a secure property interest but rather the hope to acquire one. *See Cole v. Milwaukee Area Tech. Coll. Dist.*, 634 F.3d 901, 904 (7th Cir. 2011) ("To have a protectable

property interest in a benefit … a plaintiff must have more than an 'abstract need or desire for it' and more than a 'unilateral expectation of it.'" (quoting *Roth*, 408 U.S. at 577)). Meanwhile, the contention that Fisk lost "a mechanism for the property to be rezoned" fares no better because the zoning process is merely a "local procedural protection[]," which "do[es] not by [itself] give rise to [a] federal due process interest[]." *Lavite*, 932 F.3d at 1033.

Finally, adequate state law remedies remained available to Fisk. The district court relinquished supplemental jurisdiction over Fisk's state law claims, and whether Nicklas's or the City's conduct violated state laws is for the state courts to decide. In line with Nicklas's arguments, "[w]e have similarly held that, regardless of how a plaintiff labels an objectionable land-use decision (i.e., as a taking or as a deprivation without substantive or procedural due process), recourse must be made to state rather than federal court." *CEnergy-Glenmore Wind Farm No. 1, LLC v. Town of Glenmore*, 769 F.3d 485, 489 (7th Cir. 2014).

Fisk cannot claim a constitutionally protected property interest, and so its procedural due process claim fails at the threshold. Accordingly, the issue of whether Fisk "was afforded due process before being deprived of that interest does not arise." *Kim*, 14 F.3d at 1245.

### C. Equal Protection

Fisk argues in Count IV that Nicklas singled it out for disparate treatment without a rational basis in violation of the Fourteenth Amendment's guarantee against "den[ial] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Specifically, Fisk claims

that Nicklas, in his role as City Manager, blocked the Development Incentive arbitrarily and discriminately because of personal animus or favoritism toward other developers. The district court concluded that Fisk pled itself out of court by providing several legitimate reasons for Nicklas's conduct, defeating any "class of one" equal protection claim under the standard articulated in *Miller v. City of Monona*, 784 F.3d 1113, 1121 (7th Cir. 2015) (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).

Under the Fourteenth Amendment's Equal Protection Clause, a plaintiff who is not a member of a "protected class" may nonetheless bring a claim under the "so-called 'class-of-one' theory." *Fares Pawn, LLC v. Ind. Dep't. of Fin. Insts.*, 755 F.3d 839, 841 (7th Cir. 2014). To state a claim under this theory, a plaintiff must allege "(1) that [it] has been intentionally treated differently from others similarly situated, and (2) that there is no rational basis for the difference in treatment." *Id.* at 845 (citing *Olech*, 528 U.S. at 564). For the second criteria, we ask whether "a *conceivable* rational basis for the difference in treatment" exists. *D.B. ex rel. Kurtis B. v. Kopp*, 725 F.3d 681, 686 (7th Cir. 2013). In fact, the rational basis need not even be "the *actual* justification." *Id.* "[A]ny reasonably conceivable state of facts that could provide a *rational basis*" will suffice. *See Scherr v. City of Chicago*, 757 F.3d 593, 598 (7th Cir. 2014) (quoting *Lauth v. McCollum*, 424 F.3d 631, 634 (7th Cir. 2005)). We have further clarified that "[i]t is only when courts can hypothesize no rational basis for the action that allegations of animus come into play." *Flying J Inc. v. City of New Haven*, 549 F.3d 538, 547 (7th Cir. 2008).

Fisk is not a member of a protected class, so it proceeds under this class-of-one theory. On appeal, Fisk argues there

was no rational basis for Nicklas's conduct. Failing that, Fisk contends that *McDonald v. City of Winnetka*, 371 F.3d 992 (7th Cir. 2004), held that even if Fisk's complaint revealed a rational basis, its class-of-one-claim can nonetheless survive because Nicklas blocked the Development Incentive out of animus for embarrassing him in the 2017 lawsuit or favoritism, *see id.* at 1001 (quoting *Olech*, 528 U.S. at 564).

The parties dispute whether Fisk can point to an appropriate comparator to satisfy the first criteria for a class-of-one claim, which requires intentionally different treatment from others similarly situated. "Normally, a class-of-one plaintiff will show an absence of rational basis by identifying some comparator—that is, some similarly situated person who was treated differently." *Fares Pawn*, 755 F.3d at 845. "[I]f all principal characteristics of the two individuals are the same, and one received more favorable treatment, this may show there was no proper motivation for the disparate treatment." *Id.* (quoting *Swanson v. City of Chetek*, 719 F.3d 780, 784 (7th Cir. 2013)). As explained below, however, because we conclude that Nicklas had a rational basis for blocking the Development Incentive, we need not resolve the issue of whether Fisk can satisfy the first criteria for a class-of-one claim. *Id.* at 846 (holding summary judgment appropriate where no reasonable jury could find "[plaintiff] and the comparator were similarly situated, or there was a rational basis for any differential treatment").

We agree with the district court that Fisk's complaint revealed a rational basis to explain why Nicklas recommended termination of the PDA. Relying on Fisk's own submissions about the corporate entity and principals' finances, Nicklas ultimately concluded the project was not "financially viable."

Nicklas's due diligence revealed that Fisk had "no current or long-term assets that can be pledged as collateral"—other than the prospect of the Development Incentive—to obtain a loan for the estimated approximate $4,600,000 balance needed to pursue the project. Nicklas's concerns about Fisk's financial wherewithal to execute the planned multimillion-dollar project alone qualifies as a "reasonably conceivable state of facts that could provide a rational basis." *Scherr*, 757 F.3d at 598 (emphasis omitted) (citation omitted). Likewise, those financial concerns together with the litany of others cited in the City Council's April 22, 2019, meeting, including Fisk's failure to submit plans for a traffic study, square footage, storm water management, and variances and ordinances, could provide a conceivable rational basis for blocking the Development Incentive.

Fisk attempts to cast doubt on Nicklas's stated reasons for blocking the Development Incentive, but Fisk does not carry its burden to "negative any reasonably conceivable state of facts that could provide a rational basis" for Nicklas's conduct. *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 367 (2001) (citation and internal quotation marks omitted); *Bell v. Duperrault*, 367 F.3d 703, 707 (7th Cir. 2004) (burden lies with plaintiff). Fisk makes three arguments why "[l]ogic, reason, and common sense are missing" from this case, "given the patently and knowingly false statements being publicly released." First, Fisk appears to assert that Nicklas's public statements to the media regarding concerns about Fisk represent nothing more than "an orchestrated campaign of retaliation" for the 2017 lawsuit and thus evidence illegitimate animus. Fisk thus questions Nicklas's *motivation* in blocking the Development Incentive, which we do not consider until we can "hypothesize no rational basis." *Flying J*, 549 F.3d at 547.

Second, and more relevant on appeal, Fisk challenges Nicklas's doubts about Fisk's financial health as a rational basis. However, Fisk does not affirmatively state what working capital or collateral the principals had in hand. Fisk's generalized, conclusory argument that Nicklas's stated reasons for terminating the PDA were "untrue reasons" and were "false, illegitimate claims" does not "negative" Nicklas's specific doubts about Fisk's financial health.[4] *See id.* at 546 (applying *Lauth* standard on Rule 12(b)(6) motion). In its reply brief, Fisk adds "alleging depend[e]nce on lender financing is an irrational dichotomy: if [Fisk] had no working capital or collateral, it *could not* receive lender financing." It was not irrational for Nicklas to conclude the City should not finance a company that relies solely on those City-provided funds to obtain the remainder of the money needed to complete the project. "The rational-basis requirement sets the legal bar low …." *Kopp*, 725 F.3d at 686. Nicklas's concerns about the use of millions of dollars in taxpayer funds easily clear that bar.

Third and finally, Fisk argues that another of Nicklas's proffered reasons for terminating the PDA, that the entity lacked hotel experience, is not a rational basis either. Fisk contends that it should have been "evaluated in its own right separate from its principal members or … only … through its two principal-agent members." We do not need to opine on whose experience matters: Fisk has not claimed that Fisk *or* its

---

[4] At oral argument, Fisk for the first time affirmatively stated that it had "working capital." It referred to a March 2019 phone call between Nicklas and the principal's banker about the principal's personal finances. Fisk did not raise this argument before the district court, and it is therefore waived. *See Jackson v. Parker*, 627 F.3d 634, 640 (7th Cir. 2010).

principals were not inexperienced.[5] Therefore, Fisk has not negated Nicklas's claim that it was inexperienced as a "conceivable" rational basis either. *See Miller v. City of Monona*, 784 F.3d at 1121–22 (reasoning dismissal is warranted where "the complaint reveals a rational basis … for the actions of [the defendant]").

In sum, the only evidence to which Fisk points to support its position that Nicklas's reasons were neither legitimate nor true is unavailing. Fisk does not refute any of Nicklas's concerns about Fisk's financial health or inexperience. The only thing lacking "logic, reason, and common sense" is Fisk's convoluted attempt to invalidate these justifications.

Even failing to show a valid comparator, Fisk pushes forward, insisting that its class-of-one claim can proceed because it has alleged that Nicklas acted on animus flowing from the 2017 litigation. Fisk relies on our decision in *McDonald* to argue that "the existence of a rational basis is not necessarily fatal" to its case. Specifically, Fisk points to our statement in *McDonald* that a plaintiff's burden is an either–or proposition: either "there is no rational basis for the difference in treatment *or* the cause of the differential treatment is a 'totally illegitimate animus.'" *McDonald*, 371 F.3d at 1001 (emphasis added). However, since *McDonald* we have clarified that "[i]t is only when courts can hypothesize no rational basis for the action that allegations of animus come into play." *Flying J*, 549 F.3d at 547. Thus, even assuming Nicklas had an ulterior motive,

---

[5] Fisk's broad statements that Nicklas's stated reasons were "untrue" do not suffice here either. Although Fisk affirmatively argued that the principals had experience for the first time during oral argument, it did not raise this argument before the district court or in its briefing on appeal, and it is therefore waived as well. *See Jackson*, 627 F.3d at 640.

the finding of a rational basis is "the end of the matter—animus or no." *Fares Pawn*, 755 F.3d at 845.

Up to this point, Fisk has not adequately pleaded any of its claims. Fisk's additional arguments relying on our decisions in *Esmail v. Macrane*, 53 F.3d 176 (7th Cir. 1995), and *Swanson v. City of Chetek* do not help Fisk because unlike this case, in those cases we did not find a legitimate basis for the state actors' conduct. *See Esmail*, 53 F.3d at 179–80 (reversing dismissal where "the unequal treatment is alleged to have been the result solely of a vindictive campaign by the mayor"); *Swanson*, 719 F.3d at 784–85 (reversing in absence of alternative explanation for government actor's facially illegitimate, hostile conduct).

Fisk's allegations do not carry its burden to invalidate Nicklas's rational basis for blocking the Development Incentive. Thus, the only way Fisk could proceed at this juncture would be to identify a sufficiently similar developer with "red flags" regarding its financial wherewithal and other deficiencies. *Fares Pawn*, 755 F.3d at 848. Fisk did not do so. Accordingly, nothing in the complaint "cause[s] us to question" Nicklas's treatment of Fisk. *See Sung Park v. Ind. Univ. Sch. of Dentistry*, 692 F.3d 828, 833 (7th Cir. 2012). Fisk has therefore failed to state a violation of its Fourteenth Amendment equal protection rights.

### III. Conclusion

For the foregoing reasons, we AFFIRM the opinion of the district court granting defendant's motion to dismiss.