In the

# United States Court of Appeals
## for the Seventh Circuit

———————————

No. 21-3237

GREENWALD FAMILY LIMITED PARTNERSHIP,

*Plaintiff-Appellant*,

*v.*

VILLAGE OF MUKWONAGO,

*Defendant-Appellee*.

———————————

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 20-CV-0048 — **Lynn Adelman**, *Judge*.

———————————

ARGUED NOVEMBER 8, 2022 — DECIDED APRIL 29, 2024

———————————

Before SYKES, *Chief Judge*, and WOOD and SCUDDER, *Circuit Judges*.

SYKES, *Chief Judge*. The Greenwald Family Limited Partnership owns large tracts of undeveloped land in the Village of Mukwonago, a municipality about 30 miles southwest of Milwaukee. From 2003 to 2013, municipal officials were receptive to the Partnership's development proposals, leading to the successful completion of several mutually beneficial projects. The relationship changed in 2014 when

the Partnership's plan to purchase a 4-acre plot of farmland in an area known as "Chapman Farms" collapsed when the proposed land division failed to satisfy the Village's development conditions.

Based on the failed land deal and several other conflicts with the Village, the Partnership sued in state court, later adding a "class of one" equal-protection claim accusing the Village of irrationally singling it out for unfavorable treatment in violation of its rights under the Fourteenth Amendment. The Village then removed the case to federal court.

To support its claim of discriminatory treatment, the Partnership pointed to a half-dozen adverse municipal decisions regarding its properties. But it focused primarily on two: the unsuccessful Chapman Farms transaction and a new road in another part of the Village that was rerouted from the Partnership's property. The district judge concluded that the Village had a rational basis for its actions regarding Chapman Farms, the new road, and the other adverse decisions regarding the Partnership's properties. The judge accordingly entered summary judgment for the Village and relinquished jurisdiction over the state-law claims.

We affirm. To prevail on its class-of-one equal-protection claim, the Partnership had the burden to show that the Village's actions lacked any conceivable rational basis. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). This is a heavy lift, and the Partnership failed to carry its burden. The Village's decisions regarding the Partnership's development proposals and properties were rationally related to its legitimate interests in promoting its land-use objectives and protecting the public fisc.

# I. Background

The Greenwald Family Limited Partnership—formed by
the late Darwin N. Greenwald and his son, Darwin D.
Greenwald—owns acres of commercial and undeveloped
property in the Village of Mukwonago. For many years the
Partnership successfully collaborated with the Village on
development projects involving its properties. The relation-
ship deteriorated in 2014, the year after the Village created
the position of village administrator and hired John Weidl to
fill that role. The Partnership blames Weidl for the change in
its relationship with municipal officials.

## A. Chapman Farms

The story begins in September 2014 when the Partnership
offered to buy a 4-acre plot of land on the eastern edge of a
19.6-acre property known as Chapman Farms, located west
of State Highway 83 in the northwest corner of the Village.
The offer proposed to carve out the 4-acre parcel and leave
the Chapman family, the sellers, with a remnant parcel of
about 15.6 acres. So the agreement between the Partnership
and the Chapmans was contingent upon municipal approval
of the land division. That, in turn, required a certified survey
map that met the Village's requirements.

Tamara Towns-Pozorski—the Partnership's agent and
granddaughter of the elder Darwin Greenwald—filed an
application for a certified survey map with the Village's Plan
Commission. Bruce Kaniewski, the village planner, respond-
ed with a letter outlining several problems with the applica-
tion. Among other concerns, he explained that a certified
survey map could not be approved without a developer's
agreement, backed by a surety in the form of a letter of credit

and reflecting the subdivider's commitment to install required infrastructure improvements, including the construction of an access road from Highway 83, which abuts and runs parallel, in a north–south direction, to the parcel. He advised Towns-Pozorski that the placement and construction of the access road also required approval from the Wisconsin Department of Transportation.

Kaniewski asked Towns-Pozorski to respond to his concerns by December 3, ahead of the Plan Commission's December 9 meeting. On the December 3 deadline, Towns-Pozorski—who had minimal experience as a developer and had never been involved in a project requiring a certified survey map—submitted a revised application and a one-page document titled "Statement and Developer's Agreement" bearing her signature and the signature of Fern Chapman on behalf of the Chapman family. Despite the title, this document was not in fact a developer's agreement, which is a contract between a developer and the Village specifying their respective commitments regarding a proposed development project. The document Towns-Pozorski submitted contained no development plans, no details about infrastructure improvements (e.g., the access road and utilities), no construction drawings, no construction-cost estimates, no timeline for construction, and no surety for the cost of construction.

Instead, the one-page document simply explained Towns-Pozorski's position that the development details could wait. Regarding Kaniewski's request for information about the access road, she proposed "holding-off on construction of the new street within the dedicated right-of-way" until she was "able to move ahead in trying to make

something happen on the … lot." She acknowledged that "the costs of the street construction" were her responsibility as the developer, but she explained that her "first step is to secure the purchase of the land." She said that she planned to seek rezoning for the parcel—from multifamily residential to commercial—if the certified survey map was approved and that she wished to keep her plans private "for now" but would "certainly reveal them" when she applied for building permits.

Kaniewski reviewed the revised application and issued a report to the Plan Commission indicating that he could support the requested certified survey map *contingent upon* the applicant's satisfactory compliance with several necessary conditions, including approval by the Village Board of a developer's agreement requiring the construction of the Highway 83 access road. Kaniewski explained that although the Partnership had no present plans to develop the property, the proposed division of the Chapman Farms property could not proceed without a developer's agreement regarding the construction of improvements. *See* MUKWONAGO, WIS., MUN. CODE § 45.13 (requiring a developer's agreement to subdivide a property of 5 acres or more in a residential zoning district). He discussed the impact of the project on the adjacent Fairwinds subdivision, adding that the placement of the access road to Highway 83 was "very important to the proper traffic circulation pattern of the entire neighborhood." He also explained that the Chapmans wanted to ensure that "the remainder of their property [would] have access to the highway" and not be landlocked, which would inhibit the family's ability to sell the property for development.

For these reasons, Kaniewski advised the Commission to either require immediate construction of the access road or restrict any development of the 4-acre parcel until construction of the road was completed. He and other village staff recommended the first option. Kaniewski identified other necessary conditions as well, including the village engineer's sign-off on the project and the Department of Transportation's approval of the road.

The Commissioners accepted Kaniewski's recommendations and conditionally approved the application contingent on compliance with the conditions the village staff had described—in particular, the submission of a developer's agreement that included a commitment to build the access road, preliminary construction drawings, a timeline for construction, and a surety agreement "in an amount of the estimated construction cost." The Commission made it clear that the Village Board would not approve the proposed certified survey map until the village engineer and village planner confirmed that the Partnership had satisfied all conditions outlined in the tentative approval.

Towns-Pozorski was discouraged by the Commission's decision. On December 10, the day after the meeting, she emailed Kaniewski to clarify the Village's exact requirements and to request a draft developer's agreement. She explained that the Partnership needed to "consider the bottom line and make a decision as to whether [or] not we can continue with our plans" or "must drop them." Towns-Pozorski continued to email Kaniewski as December wound down and the new year began. She wondered if a temporary driveway might satisfy the Village (rather than immediate

construction of the access road) and generally hoped to keep the deal on track.

In mid-January 2015, Kaniewski followed up with Towns-Pozorski. He told her that the Department of Transportation required a traffic-impact analysis and a pending land development before it would permit construction of the access road. He also explained that the Chapmans had confirmed that they "[did] not want to be left without access to the remainder of their property." Kaniewski emphasized that the Village's position on the access road remained the same: "[W]e need a commitment to complete the street," which now required completion of a traffic-impact analysis as required by the Department of Transportation. Several days later Towns-Pozorski and the Chapmans canceled their deal.

Around the same time, the listing agent for the Chapman family contacted Weidl, the village administrator, to gauge the Village's interest in purchasing some or all of Chapman Farms. After the deal with the Greenwald Partnership fell through, the Village purchased approximately 8 acres in Chapman Farms—including the 4 acres that were the subject of the Partnership's failed transaction—for $650,000. Over the next two years, the Village constructed the access road and related infrastructure. In 2017 the Village sold the development-ready tract to Anderson Commercial Group for $750,000. Anderson entered into a developer's agreement with the Village, and its certified survey map divided the lot into four parcels. Within a year Anderson sold three of the subdivided lots for a profit.

## B.  DeBack Drive/Wolf Run Extension

The friction between the Partnership and village officials increased when the Village relocated a proposed road away from the Partnership's property to accommodate a new development southeast of the intersection of Highway 83 and I-94. The Partnership owns 47 acres of undeveloped land at that location; the DeBack family owned an adjacent 40-acre plot. Neither had a direct access road, so the Village's official map called for the eventual construction of an access road running through both properties; the projected road was known as the "Wolf Run Extension."

In 2017 Douglas DeBack, on behalf of the DeBack family, requested that the Village amend its official map to facilitate the sale of a portion of its property to ProHealth Care, a medical center. In addition to their property next to the Partnership's land, the DeBacks owned another parcel adjacent to the medical center, for a total of 100 acres. ProHealth planned to purchase the southern half of the DeBack family's property, which bordered its medical center; the DeBacks would retain the northern 50 acres. The Village's official map for the Wolf Run Extension called for a road running north–south between ProHealth's medical center and the DeBacks' property and eventually crossing a large parcel of the Partnership's property.

DeBack sought an amendment to the official map and a certified survey map that would relocate the north–south road to the east of the property that he planned to sell to ProHealth so that the road could proceed along the medical center's new eastern border. He also proposed an east–west public street to connect the new road with East Wolf Run to the west of ProHealth's property. The north–south road

would still stretch through the Partnership's property and move westward to meet East Wolf Run further north, but the proposed east–west road would provide another direct access point.

Kaniewski reviewed DeBack's application and determined that "[f]rom a big picture view, the proposals work." The Village held a public meeting on the proposed amendment to the official map. No one objected. The Village Board ultimately amended the map and approved DeBack's certified survey map.

Around the same time, Teronomy Builders, a developer, approached DeBack about the northern parcel. In August 2018 the Village signed a developer's agreement for the land with Teronomy, which planned to construct Maple Centre, a mixed-use development that would include a hotel, restaurants, shops, and an apartment complex. The Village saw the development as a significant opportunity that promised to increase its tax base and attract new businesses. To connect Maple Centre to East Wolf Run, the agreement required the Village to construct the east–west access road that was included in the 2017 map amendment.

The Village initially designed the road—named DeBack Drive—to track the direct route outlined in the (now amended) official map. A segment of the proposed path crossed a 5-acre parcel owned by the Partnership. The Village believed that this option was the cheapest, most direct route to connect Maple Centre to East Wolf Run, so the Village Board adopted a resolution to commence condemnation to acquire the strip of land required for the road.

The Partnership objected to the proposed taking. Instead it urged the Village to construct the original north–south road, which would stretch from Maple Centre through the Partnership's 47-acre lot to join East Wolf Run north of the planned east–west intersection. The Village did not budge. In addition to its concerns that the north–south extension would be more costly and less direct, the Village emphasized that the Partnership's northern parcel lacked infrastructure and a development plan. Negotiations failed, and in May 2019 the Village submitted a jurisdictional offer, a statutory prerequisite to condemn property. The Partnership again encouraged the Village to consider the north–south road, but the Village responded that it would move forward with the eminent-domain process. The following month the Partnership sued the Village in Waukesha County Circuit Court alleging that the taking did not serve a public purpose and instead was intended "to harm the Greenwalds and create an economic advantage for the Village."

The stalemate between the Partnership and the Village was complicated by the Partnership's negotiations with a potential buyer for the 5-acre parcel. At the beginning of 2019—after the Village Board passed the resolution to acquire the land for DeBack Drive but before the Village made its jurisdictional offer—the Partnership contracted to sell the 5-acre parcel to Greg Petrauski. The contract required Petrauski to build a senior-housing community and to oppose the Village's effort to construct DeBack Drive. The details are hazy, but the deal appears to have stalled over concerns about the eminent-domain dispute and zoning requirements.

Meanwhile, a little over a month after the Partnership filed its takings suit in state court, the Village delivered a written award of damages and took title to the land needed for DeBack Drive. However, several days later the Village recorded a quitclaim deed reversing its eminent-domain action and returning the strip of land to the Partnership. Weidl, the village administrator, explained in an email that he understood that returning the land would help the Partnership complete its transaction with Petrauski. The Village believed that it could move DeBack Drive 100 feet north, away from the Partnership's 5-acre property and across land that the Greenwald family had donated to the municipality years earlier.[1] The Partnership continued to press the Village to construct the Wolf Run Extension through its 47-acre parcel. For its part, the Village explained that it was open to constructing the north–south road in addition to DeBack Drive but only if the Partnership agreed to develop the surrounding property so the Village could recoup construction costs through increased tax revenue.

## C. Class-of-One Equal-Protection Claim

This appeal arises from the Partnership's first lawsuit against the Village, which challenged the use of eminent domain to take land for DeBack Drive from the Partnership's 5-acre parcel. After the Village returned that strip of land, the Partnership filed an amended complaint adding a claim for violation of its right to equal protection under the

---

[1] The Village's plan to move the placement of DeBack Drive hit a snag because the donated property was encumbered by a deed restriction that appeared to limit its use. That matter is the subject of separate litigation in state court.

Fourteenth Amendment and several new claims under state law.[2] The Village removed the case to federal court.

As support for its equal-protection claim, the Partnership relies primarily on the failed Chapman Farms deal and the disagreement over DeBack Drive, but it also mentions several other disputes with the Village. One is the Village's refusal to take over Marshview Drive, an unimproved roadway owned by the Partnership. The public uses the private road to access local businesses; the Partnership wanted the Village to maintain it to ensure safety and guarantee public access. The Village has declined to do so in the absence of an agreement by the Partnership concerning its development plans for the surrounding property.

The Partnership also points to a dispute over the removal of trees on one of its properties adjacent to Highway 83. It explains that in 2013 the Village agreed to remove the trees, which obstruct highway visibility. But the tree-removal issue was not included in the final developer's agreement between the Partnership and the Village. In 2018 the Partnership asked the Village to honor the spirit of the 2013 agreement and remove the trees. The Village declined to do so because the final developer's agreement did not include this obligation. The Village also pointed out that the Partnership would need to obtain a permit from the Wisconsin Department of Natural Resources "for vegetation removal in an environmental corridor."

The Partnership next contends that the Village unfairly denied its request for tax-incremental financing ("TIF") for

---

[2] The amended complaint also included a federal due-process claim. The Partnership has abandoned that claim.

an assisted-living development. The Village declined this request because no funding was available in the TIF district where the proposed development was located. Finally, the Partnership claims that the Village improperly levied a special assessment on its properties to recover costs spent on infrastructure improvements near Anderson's development in Chapman Farms. The Village responds that it imposed the assessment on the surrounding properties, all of which benefitted from the municipal improvements.

As evidence that it was arbitrarily and intentionally targeted for unfavorable treatment, the Partnership relies on a dozen or so emails from Weidl to municipal staff. The emails reflect an unfavorable view of the Partnership's development proposals and express frustration with the Greenwalds generally. The details are not important. As we explain later in this opinion, this case turns on the rational-basis standard that governs class-of-one claims; there's no need to consider the Partnership's claim that Weidl harbored personal animus.

The Village sought summary judgment on the equal-protection claim, noting that under class-of-one doctrine, the Partnership had the burden to prove that it was intentionally treated differently than others similarly situated and that there was no rational basis for the difference in treatment. The Village addressed the first element but focused its attention on articulating a rational basis—notably, land-use planning objectives and financial considerations—for each of the decisions at the heart of the Partnership's claim.

Moving directly to rational-basis review of the challenged municipal actions, the district judge found a rational basis for each municipal decision at issue in the case, entered

summary judgment for the Village on the equal-protection claim, and relinquished jurisdiction over the state-law claims.

## II. Discussion

We review the judge's summary-judgment order de novo, construing the record in the light most favorable to the Greenwald Partnership and drawing all reasonable inferences in its favor. *James v. Hale*, 959 F.3d 307, 314 (7th Cir. 2020). The Partnership's theory is that the Village targeted it for arbitrary and unfavorable treatment based on personal animus or favoritism toward other developers, violating its Fourteenth Amendment right to equal protection. Because the case does not involve a protected class or fundamental right, the Partnership has the "heavy burden" to prove the elements of a class-of-one claim. *FKFJ, Inc. v. Village of Worth*, 11 F.4th 574, 588 (7th Cir. 2021). A class-of-one plaintiff must establish that he was "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Olech*, 528 U.S. at 564.

Since the Supreme Court's decision in *Olech*, our cases have struggled with the question whether proof of illegitimate animus is also required; the extent to which the subjective motivations of government officials affect the analysis remains unclear. *Village of Worth*, 11 F.4th at 588–89 (collecting cases). We need not decide this question here because the two elements announced in *Olech* are clearly established. *Id.* at 588. And the Partnership's claim fails regardless of the role of personal animus.

To carry its burden at the first step in the *Olech* framework, the Partnership must prove that it was "treated differ-

ently from others similarly situated." *Olech*, 528 U.S. at 564. The Partnership and its comparators must be "*prima facie* identical in all relevant respects or directly comparable … in all material respects." *D.S. v. E. Porter Cnty. Sch. Corp.*, 799 F.3d 793, 799 (7th Cir. 2015) (quoting *United States v. Moore*, 543 F.3d 891, 896 (7th Cir. 2008)). At the second step in the framework, the Partnership must prove that "there is no rational basis for the difference in treatment." *Olech*, 528 U.S. at 564. In other words, it must "negative any reasonably conceivable state of facts that could provide a rational basis" for the difference in treatment. *Miller v. City of Monona*, 784 F.3d 1113, 1121 (7th Cir. 2015) (quoting *Scherr v. City of Chicago*, 757 F.3d 593, 598 (7th Cir. 2014)). Indeed, the proffered rational basis need not be the *actual* justification; rather, "any reasonably conceivable state of facts that could provide a rational basis will suffice." *145 Fisk, LLC v. Nicklas*, 986 F.3d 759, 771 (7th Cir. 2021) (quotation marks, emphasis, and alteration omitted).

Our analysis begins and ends at the second step. We agree with the district judge that the Village had a rational basis for every one of the decisions at issue in this case. We can generalize the rationale supporting all of them: The Village made each land-use and public-funding decision based on taxpayer costs, commercial benefits, land-use planning objectives, and other community needs. In other words, the Village acted rationally and was guided by the factors a municipal land-use and development body would be expected to consider. Indeed, we have rejected similar class-of-one claims in this context. *See id.* (finding a rational basis where a city manager blocked a development incentive that had been preliminarily approved because of concerns about the plaintiff's financial security and ability to complete

the project); *Srail v. Village of Lisle*, 588 F.3d 940, 947–48 (7th Cir. 2009) (approving cost concerns as a rational basis for a municipality's refusal to extend its water system to a subdivision).

We begin with the Partnership's proposed land division of Chapman Farms. The Village's requirements for final approval of Towns-Pozorski's certified survey map were clearly rational. The access road to Highway 83 was important to future development in the area and traffic flow in the adjacent Fairwinds subdivision. The road was also necessary to ensure that the remnant portion of the Chapman Farms property would not be landlocked after the Partnership's proposed purchase of the 4-acre plot. More fundamentally, the Village's request for a developer's agreement and surety was both required by the land-use ordinance and necessary to ensure that the thoroughfare would be constructed without public funds. This factor was particularly important because the Partnership would not disclose its development plans for the parcel, so the Village could not expect that any public funds expended on street construction would be offset by the financial benefits accruing from new development. In short, the Village aimed to protect the public treasury and to promote infrastructure improvements important to the surrounding community's development.

The Partnership counters that the Village's subsequent purchase of the parcel, construction of the road, and sale of the land to Anderson call into question the legitimacy of these justifications. We struggle to understand how the Village's later ownership and management of the lot informs the analysis. The Village's later conduct did not involve the Partnership at all. To the extent the Partnership suggests that

the Village's later ownership and sale of the Chapman property implies that the conditions on Towns-Pozorski's land-division application were arbitrary, it misunderstands the deference of our inquiry. The conditions imposed on the Partnership's proposed purchase were easily justified by ordinary development considerations. That suffices.

We turn next to the dispute over DeBack Drive. The Partnership's allegations focus on the Village's refusal to construct its preferred north–south connection from Maple Centre to East Wolf Run, but the Village had a rational basis to favor DeBack Drive. The Partnership's preferred route lacked infrastructure like utility access and a sewage system. It also provided a less direct connection between the proposed Maple Centre development and East Wolf Run. By the Village's estimate, the construction expenses for that road were several million dollars higher than DeBack Drive. The Village offered to construct the northern extension in addition to DeBack Drive *if* the Partnership committed to a developer's agreement for the larger 47-acre parcel. Again, the Village prioritized local taxpayers over the Partnership's preferences. It chose the most cost-effective option to connect a proposed development to a nearby road and refused to finance new infrastructure without the promise of an economic return.

We turn next to the basket of additional adverse actions affecting the Partnership or its properties. The Village refused to take over the maintenance of Marshview Drive—the private, unimproved roadway on the Partnership's property—without a developer's agreement in place. It was completely sensible to refuse to spend public funds without the assurance of a return for taxpayers. The Village also

declined to remove trees from one of the Partnership's properties when the governing developer's agreement, which laid out the parties' respective obligations, did not require it to do so. That too was reasonable.

The Village denied the Partnership's request for tax-incremental financing because no funding remained in the relevant TIF district. We cannot conceive of a reason to question the rationality of that justification. The Partnership relies on an email from Weidl regarding possible tax-incremental financing for a development in a *different* TIF district but does not explain its relevance to the Village's decision regarding the district at issue here.

Finally, the Village imposed a special assessment on all properties—including the Partnership's—that benefitted from the municipal improvements in Chapman Farms. It's common and completely reasonable for municipalities to recoup some construction costs from property owners who benefit from publicly funded improvements. The Partnership counters that some of the assessed property straddles the Town of Mukwonago and thus the Village lacked the authority to levy a special assessment. But the final resolution authorizing the assessment states: "The special assessments provided for hereunder shall be deferred until such time as … [t]he property or portion thereof is *within the jurisdictional limits* of the Village of Mukwonago." (Emphasis added.)

The Partnership colors its account of the Village's actions with repeated references to Weidl's emails. But his communications ultimately do not matter. Every one of the Village's actions had ample justification, firmly grounded in the legitimate governmental interests in promoting sound land-

use objectives and protecting taxpayer funds. The Partnership's claim fails regardless of evidence of personal animus.

In sum, the Partnership failed to satisfy its burden to negative any conceivable rational basis for the Village's actions. The Village safeguarded public funds by ensuring that it would enjoy a financial return before committing to constructing new infrastructure. And it advanced future development in line with long-term planning goals. These objectives may, at times, lead to outcomes that conflict with those preferred by local landowners. This tension is understandable—likely inevitable—when the goals of an individual property owner conflict with what local government believes is best for growth and development. The Partnership is a disappointed landowner; it is not the victim of unconstitutional discrimination.

AFFIRMED